549 P.2d 638

**PUBLIC SERVICE COMPANY OF NEW MEXICO, a New Mexico Corporation, and Tucson Gas & Electric Company, an Arizona Corporation, Appellants,**

v.

**NEW MEXICO ENVIRONMENTAL IMPROVEMENT BOARD, Appellee.**

**ARIZONA PUBLIC SERVICE COMPANY, El Paso Electric Company, Public Service Company of New Mexico, Salt River Project Agricultural Improvement and Power District, Southern California Edison Company, and Tucson Gas and Electric Company, Appellants,**

v.

**ENVIRONMENTAL IMPROVEMENT BOARD, State of New Mexico, Appellee.**

**Nos. 1922 and 1923.**

Court of Appeals of New Mexico.

April 6, 1976.

Richard B. Cole, Keleher & McLeod, Albuquerque, for appellants in 1922.

Fred C. Hannahs, Montgomery, Federici, Andrews, Hannahs & Buell, Santa Fe, Bruce Norton, Snell & Wilmer, Phoenix, Ariz., for appellants in 1923.

Toney Anaya, Atty. Gen., Robert A. Engel, Sp. Asst. Atty. Gen., Bruce S. Gar-

ber, Environmental Improvement Agency, Santa Fe, for appellee.

Grove T. Burnett, New Mexico Citizens for Clean Air, Santa Fe, amicus curiae.

## OPINION

HERNANDEZ, Judge.

This is an appeal from the action of the New Mexico Environmental Improvement Board (Board) amending New Mexico Air Quality Control Regulation No. 602(B).

Three points of error are alleged, the second of which is dispositive of this appeal, to-wit: The Board's enactment of the regulation is not in accordance with the law.

The parts of the Air Quality Control Act, Sections 12–14–1 to 12–14–13, N.M. S.A.1953 (Repl.Vol. 3, Supp.1975) pertinent to this appeal are the following:

"Section 12–14–2(A)—'air contaminant' means any substance, including but not limited to any particulate matter, fly ash, dust, fumes, gas, mist, smoke, vapor, micro-organisms, radioactive material, any combination thereof or any decay or reaction product thereof; (B) 'air pollution' means the emission, except as such emission occurs in nature, into the outdoor atmosphere of one or more air contaminants in such quantities and duration as may with reasonable probability injure human health, animal or plant life, or as may unreasonably interfere with the public welfare, visibility or the reasonable use of property; . . ."

"Section 12–14–5(A)—The board shall prevent or abate air pollution. (B) The board shall: (1) Adopt, promulgate, publish, amend and repeal regulations consistent with the Air Quality Control Act . . . to prevent or abate air pollution, including regulations prescribing air standards within the geographic area of the board's jurisdiction, or any part thereof. . . . In making its regulations, the board shall give weight it deems appropriate to all facts and circumstances, including but not limited to: (a) character and degree of injury to or interference with health, welfare, visibility and property; (b) the public interest, including the social and economic value of the sources and subjects of air contaminants; (c) technical practicability and economic reasonableness of reducing or eliminating air contaminants from the sources involved and previous experience with equipment and methods available to control the air contaminants involved;

. . . . . .

(9) Develop and adopt a plan or plans for the regulation, control, prevention or abatement of air pollution, recognizing the differences, needs, requirements and conditions in the different areas of the state. . . ."

Section No. 602 of the Ambient Air Quality Standards and Air Quality Control Regulations adopted by the New Mexico Health and Social Services Board on March 25, 1972 provides in pertinent part:

"602. *Coal Burning Equipment—Sulfur Dioxide*

A. No person owning or operating new coal burning equipment having a power generating capacity in excess of 25 megawatts or a heat input of greater than 250 million British Thermal Units per hour shall permit, cause, suffer or allow sulfur dioxide emissions to the atmosphere in excess of .34 pounds per million British Thermal Units of heat input.

B. After December 31, 1974, no person owning or operating existing coal burning equipment having a power generating capacity in excess of 25 megawatts or a heat input of greater than 250 million British Thermal Units per hour shall permit, cause, suffer or allow sulfur dioxide emissions to the atmosphere in excess of one pound per million British Thermal Units of heat input."

The proposed change to sub-paragraph "B" of this regulation, which is the subject matter of this appeal and which was adopted by the Environmental Improve-

ment Board on December 13, 1974, reads as follows:

"B. No person owning or operating existing coal burning equipment shall permit, cause, suffer or allow sulfur dioxide emissions to the atmosphere:

1. after July 31, 1977, in excess of 35 per cent by weight of the sulfur dioxide which would be produced upon combustion of the coal prior to any pretreatment if the coal burning equipment has a rated heat capacity greater than 250 million British Thermal Units (higher heating value) and less than 3,000 million British Thermal Units (higher heating value) per hour; or

2. after July 31, 1977, in excess of 15 per cent, by weight, of the sulfur dioxide which would be produced upon combustion of the coal prior to any pretreatment if the coal burning equipment has a rated heat capacity equal to or greater than 3,000 million British Thermal Units (higher heating value) per hour;

3. after July 31, 1979, in excess of 10 per cent, by weight, of the sulfur dioxide which would be produced upon combustion of the coal prior to any pretreatment if the coal burning equipment has a rated heat capacity equal to or greater than 3,000 million British Thermal Units (higher heating value) per hour.

As used in this subsection, 'pretreatment' means washing or any other method of removing sulfur from the coal prior to its combustion and does not include crushing or blending operations."

The board gave the following reasons for adopting this amendment and others not relevant to this appeal:

"A. To require 65% and 85%, and later in 1979, 90% sulfur dioxide control on existing smaller and larger coal burning equipment, respectively, will protect welfare, property, and the public interest by reducing the significance of air quality as a limiting factor to economic growth.

By reducing the amount of sulfur dioxide permitted in the air from existing sources, more room will be made available, up to the state sulfur dioxide standard, for new industry in the Four Corners area.

"B. The United States Environmental Protection Agency has required 70% sulfur dioxide control on coal burning equipment at Four Corners. In order for New Mexico to regain control over its air in the Four Corners region, the State must promulgate its own regulations, which must be approved by the Environmental Protection Agency. Those state regulations must be at least as strict as the E.P.A.'s under the requirements of the Federal Clean Air Act.

"C. The 70% sulfur dioxide control required by the United States Environmental Protection Agency is technically practicable and economically reasonable.

"D. The 65%, 85% and 90% emission controls have been shown to be technically practicable and economically reasonable and are attainable within the time frames set forth by the extension of time for reaching 90% control to two years.

"E. By extending the time limitation for reaching 90% control to 1979, the Board feels industry will have the time it needs to test its equipment and get it properly working.

"F. There is evidence to describe how a single source may preempt other sources if it is allowed to contaminate up to the standards.

"G. There is evidence to show that a higher controlled efficiency is necessary because of the effects on visibility."

■ Administrative bodies are the creatures of statutes. As such they have no common law or inherent powers and can act only as to those matters which are within the scope of the authority delegated to them. *Maxwell Land Grant Co., et al v. Jones,* 28 N.M. 427, 213 P. 1034 (1923). The legislative mandate in this instance is

expressed in simple and direct language: The board shall prevent or abate air pollution. The board in compliance with this mandate adopted the following standard on January 23, 1970:

"201. Ambient Air Quality Standards A. The maximum allowable concentrations of the total suspended particulate in the ambient are as follows: *Maximum Concentration* (1) 24 hour average, 150 u g/m³; (2) 7 day average, 110 u g/m³; (3) 30 day average, 90 u g/m³; (4) annual geometric mean, 60 u g/m³ . . . C. The maximum allowable concentrations of the following air contaminants in the ambient air are as follows: *Maximum Concentration* (1) sulfur dioxide (a) 24 hour average, 0.10 ppm; (b) annual arithmetic average 0.02 ppm."

The criterion was thus established for determining what concentration of this particular air contaminant, in a specific time frame, constituted air pollution.

In April 1973, the New Mexico Environmental Improvement Agency recommended to the board that this standard be amended by reducing the allowable ambient air concentrations of sulfur dioxide from 0.10 ppm to 0.05 ppm for a 24 hour average. After extensive hearings the board rejected the recommendation.

■ .With these facts in mind, we turn to an analysis of the reasons given by the board for its action. The significant part of the first reason "A" given is that "by reducing the amount of sulfur dioxide permitted in the air from existing sources, *more room* will be made available, up to the state sulfur dioxide standard, *for new industry* in the Four Corners." [Emphasis Ours.] There is nothing in the board's mandate that gives it the authority to plan for the industrial development of the area or any other area in the State. We recognize that the standards and regulations promulgated by the board will have an impact on the industrial development of the area; but such an impact should be as a consequence not by design. The author-

ity granted to an administrative agency should be construed so as to permit the fullest accomplishment of the legislative intent or policy. *Carrol v. Tarburton*, 209 A.2d 86 (Del.1965). However, such an approach to construction does not warrant allowing an administrative agency to amend or enlarge its authority under the guise of making rules and regulations.

■ The material part of the board's second reason "B", is the following: "In order for New Mexico to regain control over its air in the Four Corners region, the State must promulgate its own regulations, which . . . must be at least as strict as the E.P.A.'s [Environmental Protection Agency] under the requirements of the Federal Clean Air Act." The E.P.A. regulation requires removal of at least 70% of the sulfur dioxide emissions or stated another way, no person shall permit sulfur dioxide emissions to the atmosphere in excess of .465 pounds per million British Thermal Units of heat input. For comparison purposes, Regulation 602A requires removal of 79% or .34 pounds per million B.T.U. and 602B, before it was amended, required removal of 34% or 1 pound per million B.T.U. As to what was intended by use of the phrase, "In order for New Mexico to regain control over its air" we assume it refers to the fact that state law is always subordinate to the federal law where the field is one of concurrent power and the federal law is more restrictive. There is no authority given to the board to promulgate regulations for this reason.

■ The third reason "C" has no relevancy in this context.

The fourth and fifth reasons, "D & E", would be relevant were it necessary to modify Regulation 602(B) to prevent the Ambient Air Quality Standards from being violated by sulphur dioxide emissions, but it is not. Exhibit No. 3 of the appellant, Arizona Public Service Co., was a study, dated May, 1974, prepared by R. W. Beck and Associates, analytical and consulting engineers, for the Bureau of Reclamation entitled "Cumulative Air Quality Impact of

Four Power and Coal Gasification Facilities in the Northwest Corner of New Mexico." The purpose of this report was to analyze the cumulative air quality impact of four power and gasification facilities which are planned or already built at two times in the future, January 1, 1978 and January 1, 1986. Dr. R. S. Schermerhorn, the principal environmental engineer of R. W. Beck and Associates, during his testimony summarized the conclusions of this study as follows:

"They indicate that ambient air quality standards [Ambient Air Quality Standards, § 201, adopted January 23, 1970] can be met with $SO_2$ removal efficiencies at Four Corners as low as 35 percent. At this removal efficiency, the computations indicate a remote statistical probability of the violation of a single air-quality standard once a decade. . . .

"There would be a remote statistical probability of one violation in a decade. One one-hundredth of one percent with units operating at 35 percent, no probability indicated at all of any violation with them operating at 70 percent."

He stated the following, when questioned as to whether there might be other facilities built in the area other than those included in the study:

". . . my indication here is that these are the facilities that are anticipated by those four operators through 1986 [San Juan units 1 through 4, Four Corners units 1 through 5, Wesco and Burnham 5 units]. I have no reason to believe that there will or will not be additional industrial developments and our calculations indicate that there's room for additional industrial development, except in statistically very unlikely cases."

The only other evidence in the record relating to any violation of standard § 201 is found in the testimony of Mr. Bruce Nicholson, Program Manager for the Meteorology Section of the Environmental Improvement Agency, Air Quality Division:

"To summarize my testimony briefly, I have indicated that various diffusion models can be used to assess air quality; that the Four Corners plant is now and will be exceeding the New Mexico Air Quality standards when controlled to 30%; and that relatively high $SO_2$ concentrations from the Four Corners Plant can be experienced at large distances and that there is the possibility that the Four Corners plant if left at 30% control could limit further development in the area."

On cross-examination he stated the following:

"Q. What kind of confidence could you ascribe to the question of whether or not the Four Corners power plant at 70% control would meet the New Mexico standards, assuming you had really adequate monitoring?

"A. Based on the past work I have done for Four Corners, my feeling is that at 70% control the Four Corners plant would not exceed our existing .1 parts per million twenty four hour average.

.     .     .     .     .     .

"Q. . . . you testified at the hearing in December or the continuation in January that if the proposed standard at that time, which was roughly twice as stringent as the standard that New Mexico has adopted, were adopted . . . that the Four Corners power plant would only have to control, I think you said 72% or 76%, I'm not sure which, in order to meet those standards which are twice as stringent as the one we now have. Isn't that correct?

"A. I could look that up. I believe that is pretty much correct."

As can be seen the only evidence relates to violations of standard § 201, when sulfur dioxide is controlled to a 30% level.

▆▆▆▆ We recognize that an administrative board in making its determinations may give greater credence to some evidence rather than to some other, and that it is not a court's function to substitute its opinion for that of the administrative board. *Otero v. New Mexico State Police Board,* 83 N.M. 594, 495 P.2d 374 (1972). However, this is in situations where there is a difference or a conflict in the evidence, not a complete absence. We are also cognizant of the following holding in *Wylie Bros. C. C. v. Albuquerque-Bernalillo C.A.C.B.,* 80 N.M. 633, 643, 459 P.2d 159, 169 (Ct.App.1969):

> "We are of the opinion that regulations adopted by a board [the Environmental Improvement Board], after substantial compliance with the public hearing requirements, need not be supported by substantial evidence
>
> .  .  .  .  .  .
>
> "Had the Legislature contemplated that regulations adopted by a board must be supported by substantial evidence adduced at the public hearing, it could easily have so stated."

This court then quoted parts of Section 12–14–7, N.M.S.A.1953 (Repl. Vol. 3, Supp. 1975). This section was repealed by the Legislature in 1970. Appeals are now governed by Section 12–12–13, N.M.S.A. 1953 (Repl. Vol. 3, Supp.1975), which provides in part:

> "I. Upon appeal, the Court of Appeals shall set aside the regulation only if found to be:
>
> (1) arbitrary, capricious or an abuse of discretion;
>
> (2) not supported by substantial evidence in the transcript; or
>
> (3) otherwise not in accordance with law."

There is no evidence in this record of any present need, or a reasonably anticipated future need, to warrant the adoption of § 602(B)(2) and § 602(B)(3) to prevent or abate violation of the ambient air quality standard § 201.

The testimony of Mr. Cubia Clayton, Chief of the Air Quality Division of the New Mexico Environmental Improvement Agency, is explanatory, not only of the agency's reasons for proposing the amendment, but of the board's reasons for adopting it. These are some excerpts of that testimony:

> ".  .  . I would like to say first that we are considering the regulations today for a couple of reasons. The first reason, of course, is the fact that the State implementation plan and the corresponding regulations for SO₂ have been disapproved by the Environmental Protection Agency. .  .  . [W]e feel that it is necessary .  .  . that the regulation we end up with is an approvable one .  .  . and thereby return to New Mexico the control of New Mexico air .  .  . The second reason is an economic reason .  .  . I think one of the most important reasons for reconsideration of the regulations at this time, particularly regulation 602 on SO₂ emissions, is because of the potential limitation that an existing source can impose on new industry. .  .  . [T]o allow any existing source to use up more than its fair share of the air shed is going to impose a ceiling on potential development .  .  . No one, at this point in time, I think could say exactly what or how extensive the new development in this region might be. .  .  . [S]o I think the focus properly should shift from how much room we allow in trying to guess what kind of new industry may be involved to what can technology do. .  . I don't think it is reasonable to ask an existing source to do better than the best technology available for it. .  .  . Nonetheless, one ought to do the best job that can be done .  .  . [W]hat we are trying to do is to get the best technology put on those plants and then hopefully be able to leave them alone unless the

development in the region is such that at some point in time it is simply necessary to reexamine the whole thing . ."

Reason "F" given by the Board is answered by our holding as to their first reason "A": there is nothing in the Board's mandate that gives it the authority to plan for the industrial development of this or any other area in the State.

■ There is no substantial evidence in the record to support the Board's final reason "G". Sulfur dioxide in a gaseous form is a "heavy *colorless* nonflammable gas of pungent suffocating odor." Webster's Third New International Dictionary, Unabridged (1971). [Emphasis Ours.] Whether sulfur dioxide emissions can or do combine with other elements in the atmosphere to produce a visible gas, or whatever, the record does not indicate.

■ After studying Judge Lopez' dissenting opinion, we feel that elucidation of our reasoning is necessary lest others be confused. The Board, in promulgating standard § 201, no doubt was governed by subparagraphs (a), (b) and (c). As was stated previously, by adopting this standard, the Board established the criterion, the yardstick if you will, for determining what concentration or quantity of this contaminant, in the specified time periods, constituted air pollution. It made the judgment that concentrations over the quantity prescribed would injure health, interfere with visibility, adversely affect the public welfare, etc.

> "Standard applies to any authoritative rule, principle, or measure used to determine the quantity, weight, or extent, or especially the value, quality, level, or degree of a thing." Webster's Third New International Dictionary, Unabridged (1971).

The Board having set the standard is bound by it, the same as any one else. See *Pellman v. Heim,* 87 N.M. 410, 534 P.2d 1122 (Ct.App.1975); *Davis v. Dept. Health & Social Services,* 84 N.M. 79, 499 P.2d 1001 (Ct.App.1972). It has the continuing authority to change the standard, after proper

notice and hearing, and to adopt regulations to implement or explain it. However, it may not set a new standard or adopt regulations implementing or explaining it for any reason other than to "prevent or abate air pollution." Likewise, the Board cannot adopt regulations implementing or explaining standard § 201 except to "prevent or abate air pollution."

Accordingly, the petition to set aside § 602(B)(1) is denied. It is granted as to § 602(B)(2) and (3) on the grounds that the action of the Board in adopting them was not in accordance with law and these sections are hereby set aside.

IT IS SO ORDERED.

SUTIN, J., concurs.

LOPEZ, J., dissents.

LOPEZ, Judge (dissenting).

I dissent.

The issue presented by this case is an administrative agency's authority to set regulations in accordance with its statutory authority and the deference an appellate court must show to determinations made by an administrative agency when there is substantial evidence to support them. The majority opinion, without examination of the relevant statutory authority, concludes that the Environmental Improvement Board lacks this authority. The opinion then disregards the substantial evidence found in the record to conclude that there is no need for a change in the emission regulation.

A brief synopsis of the governing statutes is necessary to frame the issues in the case. New Mexico, pursuant to its Air Quality Control Act, (§§ 12–14–1 to 12–14–13, N.M.S.A.1953 (Repl.Vol. 3, Supp. 1975)) has adopted an Ambient Air Quality Standard for sulfur dioxide, § 201, Air Quality Control Regulation. This standard specifies the maximum allowable concentration of various air contaminants, including sulfur dioxide. Standards are not

designed to "provide a sharp dividing line between air of satisfactory quality and air of unsatisfactory quality. They are, however, numbers which represent objectives that will preserve our air resources." Section 201, Air Quality Control Regulation.

The federal Clean Air Act also plays an important role in this case. 42 U.S.C. § 1857 (1976). Under the federal scheme, a national primary ambient air quality standard for sulfur dioxide has been promulgated. 40 C.F.R. § 50.4 (1975). Primary standards are said to "define levels of air quality which the Administrator judges are necessary, with an adequate margin of safety, to protect the public health." 40 C.F.R. § 50.2(b) (1975); 42 U.S.C. § 1857c–4(b)(1) (1976). The Act requires each state to submit a plan which specifies how the state will achieve and maintain the national standard, 42 U.S.C. § 1857c–5(a)(1) (1975). New Mexico's implementation plan was rejected insofar as it related to control of sulfur dioxide emissions in the Four Corner's area, and the Environmental Protection Agency imposed its own stricter controls. 40 C.F.R. § 52.1624 (1975). The Environmental Protection Agency has proposed acceptance of New Mexico's plan on the basis of the regulations which are the subject of this suit. 40 Fed.Reg. 48941 (1975).

Another statutory mechanism with an important bearing on this case is the New Mexico and federal treatment of new sources of air pollution. The New Mexico Air Quality Control Act provides authority for the Board to deny a permit for new sources if "the new source will emit a hazardous air pollutant or air contaminant in excess of a federal standard of performance, or a regulation of the board." Section 12–14–7(C)(3), supra. The federal provision, which is also subject to enforcement by the Administrator if the state plan is inadequate, states that new source permits must be denied if granting them will prevent the achievement of the national air quality standards. 42 U.S.C. § 1857c–5(a)(2)(D) (1976).

The fundamental dispute between the litigants here concerns the manner in which emission regulations are fixed. Industry contends that emission regulations must be set at such a level that the New Mexico standard will be just met, but not exceeded. Another way of putting this is to say that once the Board has decided on the air quality standard, its only job is to calculate what level of emissions will cause this standard to be met. The Board maintains that the standard does not control the emissions regulation; different factors were stressed in arriving at a standard than in arriving at a permissible emissions level. The Board argues that its statutory mandate requires it to set the emissions regulation after examination of various considerations; it is not directed to merely select a standard and then tailor the emissions regulation to fit it.

Once it is decided whether the Board can set emission regulations at a level lower than that necessary to meet the standard, the remaining issue is what statutory provisions are intended to control the Board's discretion. This inquiry is necessary to determine whether the Board's decision is in accordance with law.

The first issue—whether the standard automatically sets the emissions level—must be resolved by examination of the statute giving the Board authority to set standards and regulations.

The relevant portion of the statute reads as follows:

"12–14–5. *Duties and powers of board.* —A. The board shall prevent or abate air pollution.

"B. The board shall:

"(1) Adopt, promulgate, publish, amend and repeal regulations consistent with the Air Quality Control Act [12–14–1 to 12–14–13] to prevent or abate air pollution, including regulations prescribing air standards within the geographic area of the board's jurisdiction, or any part thereof. Regulations shall not specify the method to be used to

prevent or abate air pollution. Any regulation promulgated under this section shall be consistent with federal law, if any, relating to control of motor vehicle emission. In making its regulations, the board shall give weight it deems appropriate to all facts and circumstances, including but not limited to:

"(a) character and degree of injury to, or interference with, health, welfare, visibility and property;

"(b) the public interest, including the social and economic value of the sources and subjects of air contaminants;

"(c) technical practicability and economic reasonableness of reducing or eliminating air contaminants from the sources involved and previous experience with equipment and methods available to control the air contaminants involved;"

The statute refers to both standards and regulations. It includes, *within* the general directive to adopt regulations to prevent or abate air pollution, the directive to adopt regulations prescribing air standards. It then states that in making its "regulations" the Board should consider the enumerated factors. I would conclude that because "regulations" includes "standards" the legislative intent was to require attention to the enumerated factors in making both regulations and standards.

Industry argues that the overriding purpose of the Board's regulatory power is to prevent "air pollution" and that regulation of anything less than air pollution is outside the Board's jurisdiction. The premise on which industry's argument is bottomed is that the ambient air quality standards define air pollution. "Air pollution" is defined in the Act as ". . . the emission, except as such emission occurs in nature, into the outdoor atmosphere of one or more air contaminants in such quantities and duration as may with reasonable probability injure human health, animal or plant life, or as may unreasonably interfere with the public welfare, visi-

bility or the reasonable use of property." Section 12–14–2(B), supra. The case before us does not concern how the standards were established, but we can ascertain from the statutory provisions that there is no necessary relationship between the standard and the definition of air pollution. Even if it were assumed that the standard defines air pollution, the Board is directed to "prevent or abate" air pollution; and in abating air pollution it can regulate lesser evils than those that "with reasonable probability injure human health, animal or plant life."

Another indication that the legislature did not intend to prohibit all regulation of emissions under the air quality standard is found in the statutory provision for municipal and county-wide administration of air quality. Section 12–14–4(A), supra. Under this section local Boards, which are subject to the same statutory direction as the state board to regulate "air pollution", are allowed to set *stricter* regulations than the state regulations. Section 12–14–4(A), supra; *Wylie Bros. C. C. v. Albuquerque-Bernalillo C.A.C.B.*, 80 N.M. 633, 459 P.2d 159 (Ct.App.1969).

Once it is determined that the Board is not compelled to set the emissions regulation at such a level as to meet the standard, the issue becomes whether the Board has acted in accordance with law in adopting the emissions regulation. The applicable statutory provisions are, as shown above, enumerated in § 12–14–5(B)(1), supra.

Two of the reasons given by the Board relate to the need to leave room for more industrial development in the Four Corner's area. The problem addressed by the Board is that under its own statute, and under the federal Clean Air Act, permits for new industry *cannot* be given if allowing the new industry will cause a violation of the air quality standards. Put simply, if the present regulations allow pollution up to the level of the standards, there will be no room for a new industry if it produces any pollution.

The majority opinion does not contend that there was not substantial evidence of future growth and of the effect of new plants on the ambient air quality, but instead contends that the Board has no authority to regulate for these reasons. The Board's reasons for its adoption of this regulation is that this emission level will protect "welfare, property and the public interest" by keeping air pollution considerations from being a restraining factor on future growth. By statute the Board is directed to consider "the public interest, including the social and economic value of the sources and subjects of air contaminants" (§ 12–14–5(B)(1)(b), supra) in making its regulations. The "public interest" is a broad enough concept to permit the Board to weigh how the public will best be served: by permitting the first plants in the area to "use up" the clean air, or by weighing the hardship to these appellants against the "social and economic value" of the new industries which the area expects to attract. See, *New Mexico Mun. L., Inc. v. New Mexico Envir. Imp. Bd.*, 88 N.M. 201, 539 P.2d 221 (Ct.App. 1975), (administrative interpretation of "broad legislative concerns"). The Board has also concluded that the "welfare . . . and property" of the area's citizens will be unduly interfered with if new plants are kept out because of the pollution of these plants. Consideration of the welfare of these citizens is specifically authorized in subsection (B)(9) of this statute where the Board is instructed in developing its plan for the regulation of air pollution to recognize "the differences, needs, requirements and conditions in the different areas of the state". Section 12–14–5(B)(9), supra.

None of the considerations which the statute specifies are limited in time to the present. Considerations such as the "public interest" do not express a legislative intent that the Board be short-sighted in its evaluations. There is no statement in the regulations that the social and economic effects of the Board's actions occur "as a consequence not by design", and the Board could be considered derelict in its duties if it did not plan for the future effect of the decisions it makes today.

The second reason given by the Board for its decision is that removal of at least 70% of the sulfur dioxide emissions is necessary if New Mexico is to regain control of its air. The Air Quality Control Act states that the Board is "the state air pollution control agency for all purposes under federal legislation relating to air pollution and may take all action necessary to secure to this state and its political subdivisions the benefits of such federal acts." Section 12–14–3, supra. The federal Clean Air Act gives primary responsibility to each state to maintain the air quality standards within that state. 42 U.S.C. 1857c–2(a) (1975). Practical reasons dictate that the Board is justified in acting to obtain control over New Mexico's air. Unless the Board regains this authority, the legislative intent that a New Mexico agency deal with questions of air quality, as indicated by establishing this Board, will be frustrated. Further, if the Board continues to promulgate regulations below the federal requirements, its actions will be without effect, a result we cannot assume the legislature desired. *Trujillo v. Romero*, 82 N.M. 301, 481 P.2d 89 (1971); *Martinez v. Research Park, Inc.*, 75 N.M. 672, 410 P.2d 200 (1965).

The next three reasons relate to the technical and economic feasibility of achieving the emission regulations which were adopted. The majority opinion does not take issue with the Board's conclusion that the regulations are technically and economically feasible.

The majority opinion does conclude, despite the appellants' failure to contest this point, that there is no substantial evidence to support the Board's conclusion that it is necessary to modify the old emission regulation to prevent the standard from being violated. I think there is substantial evidence to support the Board's

conclusion and that the majority opinion disregards the standards of appellate review in reaching a contrary conclusion. *Royal International Optical Co. v. Texas State Optical Co.*, 90 N.M. —, 559 P.2d 398 (Ct.App.1976) (Sutin, J., dissenting); cert. granted, March 1, 1976. Mr. Nicholson's testimony was that " . . . on three different occasions, by two different people, and using models which have been matched to actual monitoring data for the Four Corners plant, it was shown that existing emission regulations for $SO_2$ [sulfur dioxide] are not sufficient to prevent state ambient air quality standards from being exceeded." His statement on cross-examination, quoted in the majority opinion, that 70% control is sufficient, cannot be cited to demonstrate that 35% control (the old regulation) is sufficient. The testimony of Dr. Michael Williams of the Sierra Club was that control over 90% would be required to meet the air quality standard. Finally, the federal government, with a standard almost the same as New Mexico's (40 C.F.R. § 50.4) found that New Mexico's control was insufficient. The evidence was conflicting, and there was substantial evidence to support the Board's findings.

Finally, I disagree with the statement that there was no substantial evidence to support the Board's finding that a higher degree of control is necessary to prevent interference with visibility. All the Board said is that sulfur dioxide emissions can contribute to a visibility problem; although this was admittedly not the critical issue in the hearings, the testimony of the New Mexico Lung Association and the Air Pollution Primer (National Tuberculosis and Respiratory Disease Association, New York, New York, 1971) introduced by them support this finding.

The regulations of the Board should be upheld.