614 P.2d 22

**KENNECOTT COPPER CORPORATION,
Appellant,**

v.

**NEW MEXICO ENVIRONMENTAL IM-
PROVEMENT BOARD, Appellee.**

**No. 3942.**

Court of Appeals of New Mexico.

Jan. 10, 1980.

Writ of Certiorari Quashed June 24, 1980.

Alfred V. J. Prather, Washington, D. C.,
Hilton A. Dickson, Jr., Silver City, for ap-
pellant.

Jeff Bingaman, Atty. Gen., Bruce S. Gar-
ber, Weldon L. Merritt, Asst. Attys. Gen.,
Santa Fe, for appellee.

## OPINION

WALTERS, Judge.

Kennecott Copper Corporation (Kenne-
cott) appeals from the New Mexico Envi-
ronmental Improvement Board's (EIB or
Board) promulgation of an amendment of
New Mexico Air Quality Control Regulation
652 limiting sulfur dioxide ($SO_2$) emissions
from existing copper smelters. The amend-
ment was adopted following public hearings
pursuant to § 74–1–9, N.M.S.A.1978 (the
Environmental Improvement Act) and
§ 74–2–6, N.M.S.A.1978 (the Air Quality
Control Act). This Court is limited on ap-
peal by § 74–1–9 I, N.M.S.A.1978, in that a
regulation can be set aside only if found to
be:

(1) arbitrary, capricious or an abuse of
discretion;

(2) not supported by substantial evidence in the transcript; or

(3) otherwise not in accordance with law. We find Regulation 652 to be none of the above and, therefore, affirm EIB's amendment.

The Board, pursuant to its legislative mandate to "prevent or abate air pollution" adopted Section No. 201(C) of the Ambient Air Quality Standards on January 23, 1970, subsequently amended on June 16, 1973, and it reads as follows:

"201. Ambient Air Quality Standards

C. The maximum allowable concentrations of the following air contaminants in the ambient air are as follows:

Maximum Concentration

1. sulfur dioxide
   (a) 24-hour average ............ 0.10 ppm
   (b) annual arithmetic average ... 0.02 ppm"

In addition, the Board was also mandated to do other things:

Section 74–2–3(A) provides:

"The environmental improvement board is the state air pollution control agency for all purposes under federal legislation relating to air pollution and may take all action necessary to secure to this state and its political subdivision the benefits of such federal acts. * * * "

Section 74–2–5(B)(4) provides:

"advise, consult, contract and cooperate with municipalities, A class counties, other states, the federal government and other interested persons or groups in regard to matters of common interest in the field of air quality control. * * * "

The Clean Air Act Amendments of 1977 [42 U.S.C. § 7410] required the state of New Mexico to submit revisions to its State Implementation Plan (SIP) before January 1, 1979, to demonstrate attainment of the ambient air standards for the area surrounding Kennecott's smelter at Hurley, New Mexico. This area had previously been designated a non-attainment area by the federal Environmental Protection Agency (EPA). According to the EPA, this amendment was required to conform New Mexico's regulation to the federal Clean Air Act Amendments of 1977. The contested amendment requires Kennecott to reduce its sulfur emissions from the present 10,900 pounds per hour to 3,550 pounds per hour after 1982, and to 3,000 pounds per hour after 1983, a reduction which will result in an increase of a 60% sulfur capture to a capture of 87%. Kennecott contends such a reduction can only be achieved by substantially reconstructing its Hurley smelter at a cost of at least $100,000,000. It maintains the expenditure cannot be justified, considering the present economic condition of the copper industry in general and of Kennecott's Hurley smelter in particular. Accordingly, Kennecott submits that enforcement of the amended regulation would force it to close its Hurley smelter.

The pertinent duties and powers of the EIB are stated in § 74–2–5, N.M.S.A.1978:

A. The board shall prevent or abate air pollution.

B. The board shall:

(1) adopt, promulgate, publish, amend and repeal regulations consistent with the Air Quality Control Act [§ 74–2–1 to § 74–2–17 N.M.S.A.1978] to prevent or abate air pollution, including regulations prescribing air standards, within the geographic area of the board's jurisdiction, or any part thereof. * * * Regulations shall not specify the method to be used to prevent or abate air pollution * * *. In making its regulations, the board shall give weight it deems appropriate to all facts and circumstances, including but not limited to:

(a) character and degree of injury to, or interference with, health, welfare, visibility and property;

(b) the public interest, including the social and economic value of the sources and subjects of air contaminants;

(c) technical practicability and economic reasonableness of reducing or eliminating air contaminants from the sources involved and previous experience with equipment and methods available to control the air contaminants involved; * * *.

In accordance with the above mandate to "prevent or abate air pollution," EIB amended Regulation 652 and gave the following reasons for adopting the amendment:

1. The EIB has a mandate under the federal Clean Air Act to insure that federal and state standards are not exceeded in an affected area.

2. The information on public record supports the regulation as being necessary to meet those standards.

3. The federal Clean Air Act also does not permit the Supplementary Control System.

4. Economic information given the Board in the hearing did not support doing anything less than what is proposed by the EIB [Environmental Improvement Division].

5. The regulation as adopted here does permit relief over an extended period of time by the vehicle of a non-ferrous smelter order built into the Clean Air Act Amendments of 1977 which does permit some flexibility for economic condition change.

6. While there was considerable discussion about three, six or twenty-four hour averaging periods, the hearing record really supports only a twenty-four hour averaging period. It is the Board's interpretation that the twenty-four hour running average that is built into the regulation just adopted will be an adequate assurance that the federal standard will not be exceeded.

Reason 6, *supra*, is not challenged by appellant. Appellant contends, however, that EIB has promulgated this regulation as an attempt to meet federal rather than state law, and it thus violates this Court's holding in *Public Service Co. v. New Mexico Environmental Improvement Board*, 89 N.M. 223, 549 P.2d 638 (Ct.App.1976). Appellant argues that the first three reasons stated by EIB clearly indicate the EIB was following "a mandate under the federal Clean Air Act" rather than any provision of state law in adopting the amendment. We do not believe EIB's adherence to federal require-ments creates the automatic conclusion that it has ignored its obligations under State law.

■ The reasons set forth by the Board give us sufficient indication of the basis upon which the amendment was adopted. *New Mexico Mun. League, Inc. v. New Mexico Envir. Imp. Bd.*, 88 N.M. 201, 539 P.2d 221 (Ct.App.1975); *see also Bokum Resources Corp. v. New Mexico Water Qual. Control Comm'n*, 93 N.M. 546, 603 P.2d 285 (1979). Although the Board has not expressly stated in its reasons that the regulation as amended was adopted "to prevent or abate air pollution," that message is clear from a reading of the amended regulation itself, together with the reasons given for its adoption. The testimony of Mr. Hargis, chief of the Air Quality Section of the Environmental Improvement Division, offers substantial evidence to support the need for the regulation:

Section C of the Environmental Improvement Division proposals is similar to Section A except that the proposed emission limit is more restrictive in order to meet the state ambient air quality standards. An emission limit of three thousand pounds per hour sulfur dioxide—of sulfur is proposed which is equivalent to sulfur dioxide emission of six thousand pounds per hour. This is the minimum degree of control adequate to assure attainment and control of the state's twenty-four-hour $SO_2$ standards and provides no margin of safety under the most adverse conditions.

Merely because federal requirements were included in the Board's decision the validity of the regulation is not destroyed. Judge Lopez pointed out in his dissenting opinion in *Public Service Co., supra*, 89 N.M. at 231, 549 P.2d 638, that the Clean Air Act imposes upon each state the obligation to submit a plan for achieving and maintaining the national ambient air quality standard established under 40 C.F.R. § 502(b). As noted above and as the EIB's "findings" disclose, the purpose of the challenged amendment was to meet *both* federal and state ambient air pollution standards.

When New Mexico standards are amended and thus made more stringent in order to comply with federal requirements, the Board is doing no more than it is obliged to do by "mandate under the federal Clean Air Act." *See* EIB's Reason 1, *supra*. At the same time, it is fulfilling the duty imposed on it by § 74–2–5 to "prevent or abate air pollution."

Kennecott's reliance on the *Public Service Co.* decision is unsound. The Board there established a standard and then adopted regulations that required performance far beyond that necessary to meet the standard. The situation here is the exact reverse. The regulations here are necessary to attain the standard previously set. The majority held in *Public Service Co., supra*, that the basic reasons given by EIB for the regulation promulgated were unrelated to the Board's statutory mission. The Board, therefore, although authorized to adopt regulations to assure that the standard will not be violated, was without authority to establish a regulation for the reasons stated in its *Public Service Co.* decision. This is not the situation presently before us.

■ Kennecott further protests that the Board did not give appropriate weight to the economic impact the new regulation would have on its Hurley operation, contrary to provisions of § 74–2–5. Finding 4 refutes that contention. Moreover, Kennecott refused to give certain economic information requested by the Board on the ground that the information was confidential to the company. We think this argument akin to the one made in *Bokum, supra*, and considering the paucity of evidence supporting Kennecott's claim that installation of a monitoring device that would continuously measure emissions is economically unreasonable, we are unable to say that the Board failed to "give weight it deemed appropriate" to all the evidence before it. Section 74–2–5 B(1)(c), N.M.S.A.1978; *Bokum, supra*. It is obviously deemed the prevention and abatement of pollutants to the degree established a weightier consideration than appellant's undocumented plea of economic hardship.

■ We also reject Kennecott's assertion that the Board specified a method of control, contrary to § 74–2–5 B(1), by requiring continuous monitoring to detect and prevent emissions beyond the limits allowed. How Kennecott achieves emission control is not a part of EIB's regulation; that it must bring its control of emissions within the limits allowed is. The Supplementary Control System in use by Kennecott is inadequate to meet the emission limitations demanded by the Clean Air Act, and Kennecott must somehow revise its system to comply with the reduced emissions allowable under the amended regulation.

The amended regulation promulgated by the Board is upheld.

IT IS SO ORDERED.

HERNANDEZ, J., concurs.

ANDREWS, J., dissenting.

ANDREWS, Judge (dissenting).

I dissent.

While I agree with most of the majority opinion, in my view the regulation subject to review here should be set aside. For two separate reasons, I consider New Mexico Air Quality Control Regulation 652 limiting sulfur dioxide ($SO_2$) emissions from existing copper smelters, to be not in accordance with law. Section 74–1–9 I(3), N.M.S.A. 1978.

The Air Quality Control Act directs the Board to consider the "economic value of the sources and subjects of air contaminants" and the "economic reasonableness of reducing or eliminating air contaminants from the sources involved." Section 74–2–5 B(1)(b) and (c), N.M.S.A.1978. The Environmental Improvement Act directs the Board to consider the "economic * * * value of the regulated activity and the * * economic * * * effects of environmental degradation" as well as the "economic reasonableness of reducing, eliminating or otherwise taking action with respect to environmental degradation." Section 74–1–9 A(2) and (3), N.M.S.A.1978. Although it is not necessary for administrative agencies to

adopt "formal findings in a judicial sense," administrative agencies must give some indication of their reasoning and of the basis upon which the regulations were adopted. *New Mexico Municipal League v. New Mexico Environmental Improvement Bd.*, 88 N.M. 201, 539 P.2d 221 (Ct.App.1975), *cert. denied*, 88 N.M. 318, 540 P.2d 248 (1975). Thus, the Board's formal reasons must be read in conjunction with the entire record. The record clearly demonstrates that "economic data played no role at all" in the promulgation of Regulation 652. The position of the Board appears to be an acceptance of a federal dictate that economics are to be given consideration only under a nonferrous smelter order. When the statute requires the Board to "give weight it deems appropriate" to economics, it cannot mean the Board is free to give economics no weight. Accordingly, the regulation should be set aside.

Further, although the Board may not set a new standard or adopt regulations implementing or explaining it for any reason other than to "prevent or abate air pollution," *Public Service Co. v. New Mexico Environmental Improvement Board*, 89 N.M. 223, 549 P.2d 368 (Ct.App.1976), *cert. denied*, 89 N.M. 321, 551 P.2d 1368 (1976), in this case it set the standard because "[t]he federal Clean Air Act * * * does not permit the Supplementary Control System." Therefore, even though the Board also included among its reasons for adoption of the regulation that the amendment is necessary to meet state standards, it is clear that the amendment is not needed to prevent or abate air pollution, but, rather, to preclude Kennecott from preventing or abating air pollution by a particular method that is in disfavor with EPA.

By setting the emission limit at 3,550 pounds per hour, the Board has effectively specified that the "continuous control method" rather than the "supplemental control method" must be used to prevent or abate air pollution at Kennecott's smelter. Rejection of the "supplemental control method" without regard to § 74–2–5 B, N.M.S.A. 1978, results in a regulation "not in accordance with law" and should therefore be set aside.