910 P.2d 906

**UNITED WATER NEW MEXICO, INC.,**
formerly known as Rio Rancho Utilities
Corporation, Petitioner,

v.

**NEW MEXICO PUBLIC UTILITY
COMMISSION, and the City of
Rio Rancho, Respondents,**

and

The Thirteenth Judicial District Court,
Real Party in Interest.

**CITY OF RIO RANCHO, a New Mexico
Home Rule Municipal Corporation,
Petitioner,**

v.

**NEW MEXICO PUBLIC UTILITY
COMMISSION, Respondent.**

Nos. 23151, 23264.

Supreme Court of New Mexico.

Jan. 17, 1996.

Keleher & McLeod, P.A., Richard B. Cole, Spencer Reid, Susan M. McCormack, Claudia Gayheart Crawford, Albuquerque, for Petitioner United Water New Mexico, Inc.

Marilyn C. O'Leary, Albuquerque, Randall D. Van Vleck, City Attorney, Rio Rancho, Lamb, Metzgar, Lines & Dahl, P.A., Bernard P. Metzgar, Albuquerque, Brownstein, Hyatt, Farber & Strickland, P.C., Charles B. White, Denver, CO, for Petitioner City of Rio Rancho.

New Mexico Public Utility Commission, Lee W. Huffman, Anastasia S. Stevens, Santa Fe, for Respondent N.M. Public Utility Com'n.

Cohen & Cohen, P.A., David S. Cohen, Santa Fe, Law Office of T.A. Sandenaw, Thomas A. Sandenaw, Jr., Las Cruces, for amicus curiae.

Tom Udall, Attorney General, Santa Fe, for real party in interest.

## OPINION

FROST, Justice.

The City of Rio Rancho (Rio Rancho) and Rio Rancho Utilities Corporation (RRUC)[1] appeal from a decision of the New Mexico Public Utility Commission (PUC) blocking Rio Rancho's condemnation and acquisition of RRUC's water utility systems. Rio Rancho and RRUC argue that the PUC had no jurisdiction over the condemnation action. We agree and therefore vacate the PUC's decision.

## I. FACTS

In 1994 the citizens of Rio Rancho voted in favor of acquiring RRUC. Rio Rancho initiated a condemnation action against the utility in district court on October 28, 1994, which RRUC vigorously contested.[2] On March 2, 1995, the trial court granted Rio Rancho the right to immediate possession of RRUC's

---

1. Since the commencement of Rio Rancho's action for condemnation, the Rio Rancho Utilities Corporation has changed its name to United Water New Mexico, Inc. For consistency we shall refer to the utility by its original initials, RRUC, regardless of which name it was using during the time period at issue.

2. Rio Rancho has the authority to acquire the utility's facilities by condemnation under NMSA 1978, Section 3–26–1(A)(3) (Repl.Pamp.1995) ("[A] municipality may, within and without the municipality . . . acquire, maintain, contract for or condemn for use as a municipal utility privately owned sewer facilities used or to be used for the collection, treatment and disposal of sewage of the municipality or its inhabitants."), and under NMSA 1978, Section 3–27–2(A)(2) (Repl. Pamp.1995) ("Municipalities, within and without the municipal boundary, may . . . acquire, maintain, contract for or condemn for use as a municipal utility privately owned water facilities used or to be used for the furnishing and supply of water to the municipality or its inhabitants. . . .").

water and wastewater systems. Rio Rancho and RRUC subsequently entered into a stipulated agreement regarding the amount of just compensation due to RRUC. The district court entered an order approving the stipulated amount, and, on June 30, 1995, Rio Rancho took possession of RRUC's facilities.

In January 1995, during the pendency of the condemnation action, RRUC filed a Petition for Declaratory Order with the PUC, Case No. 2623. The petition sought clarification of the PUC's jurisdiction over the condemnation action and inquired about the necessary PUC approvals regarding a forced transfer. On February 14 Rio Rancho filed a motion with the PUC to dismiss RRUC's petition, alleging in part that the PUC lacked jurisdiction over the transfer. In March the PUC denied Rio Rancho's motion to dismiss and requested RRUC to submit briefing for a hearing on the transfer.

The RRUC moved to withdraw its petition in April, stating that the court's order granting Rio Rancho immediate possession together with parties' stipulated agreement resolved any questions about the transfer. The PUC denied RRUC's motion and ordered RRUC to file an application for approval of the sale and abandonment of its water and sewer systems.[3] In May RRUC submitted its application for approval of the transfer of its systems to Rio Rancho. The PUC then appointed a hearing examiner to evaluate RRUC's application in PUC Case No. 2623. In July the hearing examiner concluded that Rio Rancho was a necessary party to the administrative proceeding and ordered the city to file testimony in the case. Rio Rancho entered a special appearance, objecting to the PUC's jurisdiction over itself and the transfer. The PUC rejected Rio Rancho's argument.

Rio Rancho then filed a petition for a writ of mandamus with this Court in August, asking us to dismiss the administrative case before the PUC for lack of jurisdiction. On

September 20 we denied the petition without prejudice as premature, holding that Rio Rancho could renew its petition after the PUC's hearing. Rio Rancho then submitted testimony to the hearing examiner.

In October RRUC filed a petition for a writ of mandamus with this Court, asking us to direct the PUC either to dismiss the PUC action for lack of jurisdiction or to issue its ruling by November 15. RRUC also requested a stay that would keep in effect the stipulation between Rio Rancho and RRUC regarding the reasonable value of the facilities pending resolution of all the issues. The stipulation was originally set to expire on October 30. Rio Rancho joined in the petition but opposed the stay. We granted a temporary stay pending oral argument, which was set for November 8.

On November 7 the PUC issued its final order, concluding that it had jurisdiction over the transfer and denying RRUC's application for approval of the transfer as not being in the public interest. At oral argument on November 8, we lifted the temporary stay regarding the stipulation and ruled that we would treat RRUC's petition for writ of mandamus as a notice of appeal from the PUC's decision. We now reverse the PUC. Because we find that the PUC lacked jurisdiction over the transfer in this case, we need not address the correctness of the PUC's decision denying the transfer.

## II. STANDARD OF REVIEW

As this Court recently noted in *Morningstar Water Users Ass'n v. New Mexico Public Utility Commission*, 120 N.M. 579, 583, 904 P.2d 28, 32 (1995), the determination of whether the PUC has jurisdiction over the parties or subject matter in a particular case is a question of law, and the scope of the PUC's jurisdiction is defined by statute. We explained in *Morningstar* that, although reviewing courts generally confer

---

**3.** As part of its denial of the motion to withdraw, the PUC did dismiss certain issues raised in RRUC's petition. During the course of the condemnation proceedings, the legislature amended NMSA 1978, Section 3–23–3 (Repl.Pamp.1995), removing the requirement that municipalities seek approval from the PUC when issuing reve-

nue bonds to acquire a water or sewer facility by condemnation. As a result of the amendment, the PUC concluded that Rio Rancho's revenue bond issue no longer served as a separate basis for asserting jurisdiction over the transfer of the facilities. The PUC does not assert jurisdiction under Section 3–23–3 in this appeal.

considerable deference to the PUC's determinations of legal questions that implicate agency expertise or fundamental policies, they "will accord 'little deference' to the agency's own interpretation of its jurisdiction." *Id.; see also El Vadito de los Cerrillos Water Ass'n v. New Mexico Pub. Serv. Comm'n,* 115 N.M. 784, 787, 858 P.2d 1263, 1266 (1993). Consequently, we review anew the question of the PUC's jurisdiction.

## III. PUC JURISDICTION OVER CONDEMNATION ACTIONS

■ The question before us in this case is whether the PUC has jurisdiction over the contested condemnation of a public utility's water and sewer facilities by a municipality.[4] The Public Utility Act, §§ 62–1–1 to –13–14 (Repl.Pamp.1993 & Cum.Supp.1995), sets out the general scope of the PUC's authority over public utilities. Section 62–6–4(A) of the Act provides in relevant part, "The [PUC] shall have general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates and service regulations...." However, the Act also states that the PUC has no regulatory authority over a municipality unless the municipality voluntarily submits itself to PUC regulation.[5] Section 62–3–3(E) (noting that municipalities are expressly excluded under the Public Utility Act unless they elect to be regulated); § 62–6–5 (providing voter election procedure for submitting to PUC regulation); *see also Morningstar,* 120 N.M. at 587, 904 P.2d at 37 (discussing PUC's lack of authority over municipalities). In the present case, Rio Rancho has not elected to submit itself to PUC regulation.

The PUC argues that it has jurisdiction over the transfer under the statutes governing the sale or abandonment of a utility. *See* § 62–6–12(A)(4) (sale); § 62–9–5 (abandonment). Section 62–6–12(A)(4) provides:

A. With the prior express authorization of the commission, but not otherwise:

. . . .

(4) any public utility may sell, lease, rent, purchase or acquire any public utility plant or property constituting an operating unit or system or any substantial part thereof; provided, however, that this paragraph shall not be construed to require authorization for transactions in the ordinary course of business.

Section 62–9–5 provides:

No utility shall abandon all or any portion of its facilities subject to the jurisdiction of the commission, or any service rendered by means of such facilities, without first obtaining the permission and approval of the commission. The commission shall grant such permission and approval, after notice and hearing, upon finding that the continuation of service is unwarranted or that the present and future public convenience and necessity do not otherwise require the continuation of the service or use of the facility; provided, however, that ordinary discontinuance of service or use of facilities for nonpayment of charges, nonuser or other reasons in the usual course of business shall not be considered as abandonment.

Although the PUC acknowledges that it would have no authority over Rio Rancho after the municipality acquires RRUC's facilities, it maintains that it does have jurisdiction over RRUC's transfer of those facilities to Rio Rancho as either a sale of a system or an abandonment of service. The PUC therefore argues that, regardless of the trial court's decision, RRUC must petition for and receive the PUC's approval before the condemnation transfer can be completed. The PUC contends that it also has jurisdiction

---

**4.** It is undisputed that, in the present case, RRUC vigorously challenged Rio Rancho's efforts to condemn its facilities and only entered into a stipulation regarding adequate compensation after the trial court ruled that Rio Rancho could condemn the facilities. Accordingly, we do not address the issue of a utility agreeing with a municipality to submit willingly to a condemnation action in lieu of a consensual sale simply to avoid the requirements of NMSA 1978, Section 62–6–12 (Repl.Pamp.1993) (PUC approval of sale of utility).

**5.** There is a second exception to the general exclusion of municipalities from PUC regulation which is not relevant to this case. *See* § 62–9–1.1(C); *Morningstar,* 120 N.M. at 587, 904 P.2d at 37 (discussing exception).

over Rio Rancho as a necessary party to the transfer proceedings.

■ The question of jurisdiction turns on the proper interpretation of the sale and abandonment statutes. "Our interpretation of the statute[s] must be consistent with legislative intent, and our construction must not render the statute[s'] application absurd, unreasonable, or unjust." *Aztec Well Servicing Co. v. Property & Casualty Ins. Guar. Ass'n,* 115 N.M. 475, 479, 853 P.2d 726, 730 (1993).

Because neither statute explicitly includes condemnation actions, we must determine whether the statutes include such actions by implication. We conclude that the proper reading of the statutes dictates that neither statute encompasses condemnation actions. Our conclusion is supported by the plain language of the statutes and by the legislative intent underlying the Public Utility Act.

## A. Plain Language of the Statutes

The plain language of both statutes indicates that they address *voluntary acts* by a public utility. Section 62–6–12(A)(4) refers to a public utility selling, leasing, renting, purchasing, or acquiring facilities. These are all affirmative, voluntary acts undertaken by a utility. A forced condemnation of a utility by a municipality is not a voluntary, affirmative act of that utility. Indeed the utility has absolutely no say over a municipality's decision to pursue a condemnation action against it.

■ The PUC points to language from cases that characterize a condemnation action as a "forced sale." *See, e.g., Jackson v. State,* 213 N.Y. 34, 106 N.E. 758, 758 (N.Y. 1914) (" 'Condemnation' is an enforced sale, and the state stands toward the owner as buyer toward seller."). However, this language refers primarily to the fact that the owner of the condemned property is entitled to the market value of the property, just as if the government had purchased the land on the open market. *See id.* (applying "sale" analogy to determine proper amount of just compensation). Although there may be some circumstances under which it is appropriate to equate a condemnation action to a sale of

property, *see, e.g., United States v. 27,223.21 Acres of Land,* 589 F.Supp. 1121, 1124 (D.Colo.1984) (treating condemnation as sale for purposes of interpreting lease agreement), there is a fundamental difference between a condemnation and a sale. As the Illinois Court of Appeals explained:

Condemnation, or eminent domain, is the process by which a sovereign exercises the power to "take" private property for public purposes subject to the constitutional requirement that just compensation be paid to the owner.... Thus, although just compensation is determined by attempting to approximate the voluntary marketplace, the essence of a condemnation is its involuntary, compulsory nature.

In contrast, a contract for sale or purchase requires a meeting of the minds, or mutual assent to the terms of the contract.... Both a seller and a buyer have the right to select with whom each will contract, and neither can be forced to agree with another not of his choosing.... Thus, a contract or agreement for sale or purchase is a consensual, voluntary relationship.

*Forest Preserve Dist. of DuPage County v. Brookwood Land Venture,* 229 Ill.App.3d 978, 172 Ill.Dec. 73, 77–78, 595 N.E.2d 136, 140–41 (1992) (citations omitted). We conclude that the plain language of Section 62–6–12(A)(4) refers only to voluntary transfers and not to compulsory takings by a municipality. We note that other jurisdictions have adopted a similar approach to comparable statutes governing public utility commission approval of sales or purchases. *See Decatur County Rural Elec. Membership Corp. v. Public Serv. Co.,* 159 Ind.App. 346, 307 N.E.2d 96, 104 (1974) (holding that similar statute requiring Public Service Commission approval of purchases "deal[t] only with *voluntary* sales or leases" (emphasis added)); *Public Utils. Comm'n v. City of Fresno,* 254 Cal.App.2d 76, 62 Cal.Rptr. 79, 83 (1967) (holding that statute preventing public utility from selling its systems without Public Utilities Commission approval did not govern involuntary condemnation actions brought by a city).

Similarly, we read the abandonment statute, Section 62–9–5, as logically referring only to voluntary actions by a public utility. The term "abandonment" generally refers to a voluntary act. *See, e.g., Black's Law Dictionary* 2 (6th ed. 1990) (defining abandonment in part as: "*Voluntary relinquishment* of all right, title, claim and possession, with the intention of not reclaiming it" (emphasis added)).

The Pennsylvania Supreme Court reached a similar conclusion in *Emerald Coal & Coke Co. v. Equitable Gas Co.*, 378 Pa. 591, 107 A.2d 734, 737 (1954). In *Emerald Coal* the defendant gas company challenged the trial court's jurisdiction to impose injunctive relief in an action based on tortious use of land. *Id.* The gas company argued that any court-ordered injunction would force an abandonment of its public utility which, under statute, is only allowed after PUC approval. *Id.* The *Emerald Coal* court rejected this argument, stating, "Abandonment necessarily implies the *voluntary or intentional* act of the party having the facility, right or power to relinquish it." *Id.* (emphasis added). The court concluded that any judicially-decreed cessation would be forced on the defendant and would therefore not implicate the abandonment statute under Pennsylvania's Public Utility Law. *Id.*

The facts of the present case illustrate that the abandonment statute is most reasonably read as applying only to voluntary or intentional acts of a public utility. It would be illogical to conclude that RRUC "abandoned" the same facilities that it vigorously fought to retain throughout Rio Rancho's condemnation action. In addition, to read the statute otherwise would lead to absurd results.

In *El Vadito*, 115 N.M. at 789, 858 P.2d at 1268, we explained that when a public utility abandoned and transferred its facilities to an acquiring entity that did not fall within the provisions of the Public Utility Act, the PUC had no jurisdiction over that acquiring entity. The PUC, therefore, could not condition its approval of the abandonment on whether the unregulated entity met certain prerequisites established by the PUC. The PUC's authority was limited to granting or denying the public utility's request for abandonment. *Id.*

If the PUC finds that a voluntary transfer of facilities is not in the public interest, it should deny the abandonment and may not further impose conditions over which it has no jurisdiction. Thus, under *El Vadito*, the PUC's power over public utilities reaches no farther than what is statutorily authorized.

In the present case, the acquirer of RRUC's facilities is a municipality, free from PUC regulation under the Public Utility Act. Accordingly, the PUC has no jurisdiction over Rio Rancho in its acquisition. However, Rio Rancho obtained RRUC's facilities through a condemnation action, which RRUC opposed and lost. Under the condemnation decision, RRUC no longer has the legal right to retain its facilities absent a favorable appeal. To hold that the PUC now has jurisdiction to deny approval for the transfer would place RRUC in the untenable position of being subject to a court order mandating the transfer and to a PUC order preventing the transfer.

## B. Legislative Intent

The legislative intent underlying the Public Utility Act also does not support the PUC's interpretation of the sale and abandonment statutes. In Section 62–3–1(B) of the Public Utility Act, the legislature noted the importance of regulating public utilities, stating:

It is the declared policy of the state that the public interest, the interest of consumers and the interest of investors require the regulation and supervision of such public utilities to the end that reasonable and proper services shall be available at fair, just and reasonable rates, and to the end that capital and investment may be encouraged and attracted so as to provide for the construction, development and extension, without unnecessary duplication and economic waste, of proper plants and facilities for the rendition of service to the general public and to industry.

However, the legislature also made it very clear that municipalities are excluded from the definition of public utilities under the Act, unless they elect to be governed by the Act. Section 62–3–3(E). The legislature also specifically exempted municipally owned and operated utilities from rate and service regula-

tion by the PUC. Section 62–6–4(A) of the Act, provides in relevant part, "Nothing in this section, however, shall be deemed to confer upon the [PUC] power or jurisdiction to regulate or supervise the rates or service of any utility owned and operated by any municipal corporation either directly or through a municipally owned corporation. . . ."

Thus, interpreting the Public Utility Act as a whole, it is apparent that the legislature determined that privately owned public utilities required PUC supervision and control in order to protect the public welfare. However, the legislature also concluded that municipalities were fully capable of protecting the interests of citizens served by a municipal utility both inside and outside the municipalities' borders without the need for PUC oversight. In addition, the legislature specifically granted municipalities the authority to condemn privately operated water and sewer facilities for public use without making this condemnation authority subject to PUC approval. *See* NMSA 1978, § 3–26–1(A)(3) (Repl.Pamp.1995) (municipality may condemn privately owned sewer facilities); NMSA 1978, § 3–27–2(A)(2) (Repl.Pamp.1995) (municipality may condemn privately owned water facilities). Allowing the PUC to retain jurisdiction over municipal condemnation actions as well as authority to approve or disapprove a condemnation would permit the PUC to affect indirectly what it was not statutorily authorized to regulate, namely municipal utility rates and services.

In *El Vadito,* we explained that, in a public utility transfer, the PUC could not attempt to dictate the policies of an unregulated buyer and could only approve or disapprove the decisions made by the regulated seller. *El Vadito,* 115 N.M. at 789–90, 858 P.2d at 1268–69. By logical extension, when the regulated transferor is relieved of its decision-making power in a utility transfer to an unregulated entity, any attempt by the PUC to control the forced transfer would necessarily be an attempt to regulate the policies of that unregulated entity. In the present case, the PUC denied the transfer in part because it determined that the high cost of acquiring the utility would be passed on to the customers in the form of unacceptably high rates. *In re Rio Rancho Utilities Corp. Application for Authorization to Abandon and Sell Its Pub. Util. Plant,* N.M.Pub.Util. Comm'n, No. 2623, 1995 WL 769932 (Nov. 7, 1995). We point this fact out not to comment on the substance of the PUC's decision but to note that the PUC was in effect attempting to regulate municipal utility rates indirectly.

■ Therefore, except when expressly directed to the contrary by statute, we conclude that the legislature intended municipalities to be free from PUC oversight in all actions concerning owning and operating water and sewer utilities, including acquiring private utilities' facilities through condemnation. *See Morningstar,* 120 N.M. at 588, 904 P.2d at 38 (holding that "when the legislature intended the [Public Utility Act] to apply to municipalities it did so explicitly"). As the *City of Fresno* court noted under similar circumstances: ·

It is fundamental that a statute should be given reasonable interpretation in accordance with the apparent purpose and intention of the lawmakers. Accordingly, we believe that when all of the legislative enactments on the subject are carefully considered and reconciled the conclusion is inescapable that the Legislature did not and could not have intended to include a public entity's power of eminent domain within the mandatory requirement of Public Utilities Code section 851 [requiring commission approval of sales of utilities].

Under Public Utilities Code section 10001 et seq., a city is expressly authorized to operate a public utility (including a water system), both inside and outside of its boundaries, without regulation or supervision by the commission. It seems somewhat inconsistent (and even incongruous) to assert that the Legislature *must* have intended commission approval as a prerequisite to judicial disposition of public utility property in an eminent domain proceeding, in order to protect the public utility's consumers who reside outside of the city's boundaries from rate discrimination, when it deliberately empowered a city to operate a public utility both within and outside of its boundaries without commission supervi-

sion or regulation of any kind, thereby making it possible for the city to discriminate in rates as appellant fears could happen.

*City of Fresno*, 62 Cal.Rptr. at 84–85.

In addition, our conclusion that the legislature did not intend for the PUC to have approval authority over condemnation actions is further bolstered by the legislature's recent changes to NMSA 1978, Section 3–23–3 (Repl.Pamp.1995). Section 3–23–3 requires PUC approval of the purchase price when a municipality acquires a private utility and issues revenue bonds as the means for financing the acquisition. The amendments now specifically except acquisitions made by condemnation actions from this requirement. *Id.*

## IV. THE PUC'S ASSERTION OF CONCURRENT JURISDICTION IN CONDEMNATION ACTIONS

The PUC argues that, in the interest of protecting the public welfare, the legislative grant of condemnation authority to municipalities can and should be harmonized with the grant of PUC authority over a sale or abandonment by viewing the PUC and the district court as having concurrent jurisdiction over condemnation actions for public utilities. The PUC contends that, under this dual-jurisdiction scheme, condemnation of a public utility should require two approvals, one by the district court and one by the PUC. The PUC suggests that the district court would initially determine if the municipality has the right to condemn the public utility's systems and, if so, the court would calculate the amount of just compensation to be paid. The PUC argues that it then would have the authority to determine if the amount of compensation to be paid for the system is in the public interest and to approve or deny the transfer based on this determination.

 However, such a dual-jurisdiction scheme, with the PUC retaining in essence veto power over the district court's determination of just compensation, is inconsistent with the traditional approach to eminent domain. Once a court determines that a mu-

nicipality has the authority to take certain property by condemnation, the owner then has a constitutional right to compensation for that property. N.M. Const. art. II, § 20. All that remains to be determined is what amount of compensation is just. The determination of what constitutes just compensation, however, is a judicial function. *In re City of New York*, 158 Misc.2d 378, 600 N.Y.S.2d 914, 921 (Sup.Ct.1993) (citing *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 327, 13 S.Ct. 622, 626–27, 37 L.Ed. 463 (1893)); *see also* NMSA 1978, § 42A–1–24 (Repl.Pamp.1994) (noting court determines compensation). The amount of just compensation cannot be limited by an administrative agency either directly or indirectly. *Cf. City of New York*, 600 N.Y.S.2d at 921 (noting legislature cannot limit just compensation).

In addition, the rate-based factors that the PUC considers in evaluating whether the purchase price for the public utility is in the public interest are different from the factors a court employs in determining just compensation. As the Florida Supreme Court noted, "The complete dissimilarity between rate-making concepts and the just or full compensation standards which govern eminent domain have resulted in rejection of attempts to equate rate[-]making with eminent domain as a basis for determining fair market value." *Dade County v. General Waterworks Corp.*, 267 So.2d 633, 640 (Fla.1972) (quoting trial court finding). Accordingly, it would be incongruous to acknowledge that a municipality has the right to condemn a utility system and then to allow the PUC to retain final approval authority over the amount of compensation to be paid by the municipality using standards unrelated to the court's determination of what compensation is just.

Had the legislature intended to grant the PUC authority to play a role in municipal condemnation actions, it would have done so directly (and without impinging on the constitutional or statutory requirements of eminent domain), by granting the PUC the *initial* approval authority over the municipality's decision to condemn the utility systems, prior to any court determination of the right to condemn and of the amount of just compen-

sation. *See, e.g., Montana Power Co. v. Fondren*, 226 Mont. 500, 737 P.2d 1138, 1142–43 (1987) (noting that, under state statutes, condemnor must first seek approval of Board of Natural Resources before it can exercise condemnation authority in the courts). In other words, the legislature would have expressly conditioned the municipality's right to condemn a public utility on a PUC conclusion that the action is in the public interest. Thus, only after receiving PUC approval could the municipality bring a condemnation action in court for a judicial decision that the taking was for a public use and for a determination of just compensation. *See* NMSA 1978, §§ 42A–1–1 to –1–32 (Repl.Pamp.1994) (Eminent Domain Code).

The legislature, however, has not expressly granted to the PUC approval authority over a municipality's decision to condemn a private water utility, *see* § 3–26–1(A)(3) (granting municipalities power to condemn privately owned sewer facilities without any mention of requiring PUC approval); § 3–27–2(A)(2) (granting municipalities power to condemn privately owned water facilities without any mention of requiring PUC approval), and we will not read such authority into the statute by implication. The Court of Appeals explained in *North v. Public Service Co.*, 101 N.M. 222, 227–28, 680 P.2d 603, 608–09 (Ct. App.1983), *cert. denied*, 101 N.M. 11, 677 P.2d 624 (1984), that the legislature has the authority to delegate the power of eminent domain and the grantee of that power has wide discretion as to its exercise, absent a statutory provision to the contrary. The *North* Court noted:

> [A] grant of authority by the legislature to exercise the power of eminent domain carries with it the right of the grantee of that power to decide the question of necessity as well as questions of expediency and propriety. The decision of the grantee of the power of eminent domain as to the necessity, expediency, or propriety of exercising that power is political ..., and its determination is conclusive and not subject to ... review, absent fraud, bad faith, or clear abuse of discretion.

*Id.* at 228, 680 P.2d at 609 (citations omitted). Accordingly, we find that the PUC's asser-

tion that it should have concurrent jurisdiction over the present condemnation action is without merit.

## V. CONCLUSION

We conclude that Section 62–6–12(A)(4) (sale) and Section 62–9–5 (abandonment) do not give the PUC jurisdiction over municipal condemnations of regulated water and sewer utilities and that RRUC was not required by statute to request PUC approval for the forced transfer of its facilities to Rio Rancho. Accordingly, we vacate PUC Case No. 2623 for lack of jurisdiction.

**IT IS SO ORDERED.**

FRANCHINI and MINZNER, JJ., concur.