1997-NMSC-056

947 P.2d 133

**In the Matter for the Application of Gas Company of New Mexico for an Order authorizing recovery of settlement amounts and legal consulting fees as take-or-pay costs incurred by its predecessor, Southern Union Gas Company, through Rate Rider No. 11.**

**SOUTHERN UNION GAS COMPANY, Appellant,**

v.

**NEW MEXICO PUBLIC UTILITY COMMISSION, Appellee,**

**and**

**Tom Udall, Attorney General, State of New Mexico, New Mexico Industrial Energy Consumers, and Incorporated County of Los Alamos, Intervenors.**

No. 23501.

Supreme Court of New Mexico.

Sept. 24, 1997.

Hinkle, Cox, Eaton, Coffield & Hensley, L.L.P,. James Bruce, Gary W. Larson, Santa Fe, for Appellant.

Anastasia S. Stevens, Commission Counsel, Santa Fe, for Appellee.

Tom Udall, Attorney General, Charles F. Noble, Assistant Attorney General; Steven S. Michel; Virtue, Najjar & Bartell, P.C., Daniel A. Najjar, Laura A. Ward, Santa Fe, for Intervenors.

*OPINION*

BACA, Justice.

### I.

1. Southern Union Gas Company ("Southern Union") appeals a New Mexico Public Utility Commission ("Commission") Order dismissing with prejudice Public Service Company of New Mexico's ("PNM") application for a gas rate increase. Southern Union raises several issues on appeal, including the allegation that the Commission erred in concluding that it lacked jurisdiction to consider the requested rate increase. We review the Order pursuant to NMSA 1978, Section 62–11–1 (1993) (providing for appeal of Commission orders directly to the Supreme Court). We affirm the Commission's Order based on its lack of jurisdiction to consider the requested rate increase, rendering resolution of all other appellate issues unnecessary.

### II.

2. On January 28, 1985, Southern Union sold its New Mexico gas utility assets to PNM. The Commission approved the sale, retaining jurisdiction to the extent permitted by law in order to ensure compliance with the Order authorizing the sale. Under the Purchase and Sales Agreement, Southern Union retained liability for "litigation and claims resulting from any act or omission by Southern Union ... with respect to ... the operation of the businesses." In addition, PNM agreed to pursue on Southern Union's behalf, "regulatory applications and proceedings" necessary for the recovery of these excluded obligations. Thus, Southern Union retained liability for the pre-January 28, 1985, claims later made by Unicon Production Company ("Unicon"), in connection with take-or-pay gas purchase contracts entered into by Southern Union and Unicon in the 1950s.

3. In 1989, Southern Union paid approximately $3.4 million to Unicon in accordance with a settlement agreement, which discharged Southern Union from liability for Unicon's claims arising out of the take-or-pay contracts. Southern Union then requested

that PNM file a rate increase application on Southern Union's behalf so that Southern Union could recover seventy-five percent of the costs of litigation and settlement associated with the Unicon settlement. On October 31, 1990, in compliance with the Purchase and Sales Agreement, PNM filed a rate increase request with the Commission on behalf of Southern Union.

4. Initially, the Commission dismissed the rate increase request without prejudice, acknowledging that it had jurisdiction over the subject matter and parties involved, but finding that PNM had failed to meet its burden of proof. On April 28, 1995, PNM again requested a rate increase on behalf of Southern Union. Southern Union intervened in support of PNM's application. In response to the second request, and following receipt of three motions to dismiss, the Commission entered a dismissal with prejudice without specifying the grounds for the dismissal. PNM did not appeal that Order. However, Southern Union filed both a motion for rehearing with the Commission and this appeal.

### III.

5. We are asked to review the second Commission Order disposing of PNM's rate increase application. Although Southern Union raises many issues on appeal, the dispositive issue is whether the Commission has jurisdiction over a public gas utility's request to recover costs incurred by its predecessor utility. When addressing jurisdictional determinations made by the Commission we conduct a de novo review, giving little deference to the Commission's jurisdictional determination. *United Water N.M., Inc. v. New Mexico Pub. Util. Comm'n,* 1996 NMSC 007 ¶ 8, 121 N.M. 272, 274–75, 910 P.2d 906, 908–09 (1996).

6. Southern Union points to the Commission's Order retaining jurisdiction over matters affecting the Southern Union/PNM Purchase and Sales Agreement as support for the Commission's determination that it had jurisdiction over PNM, Southern Union, and PNM's rate increase application. However, the scope of the Commission's jurisdiction is defined by statute and the Commission cannot enter an order extending the scope of that jurisdiction. *See United Water,* 1996 NMSC 007 ¶ 8, 121 N.M. 272, 910 P.2d 906; *see also Public Serv. Co. of N.M. v. New Mexico Envtl. Improvement Bd.,* 89 N.M. 223, 227, 549 P.2d 638, 642 (Ct.App.1976) (administrative agency cannot amend or enlarge statutorily defined authority). Thus, the Commission's jurisdiction over this matter cannot be founded on the language of the Order.

7. Southern Union next argues that the Commission was obligated to assert jurisdiction in this case based on their prior assertion of jurisdiction in similar proceedings. The Commission, according to Southern Union, is prohibited from changing established policies without notice to the affected parties. Without resolving whether the Commission has improperly asserted jurisdiction over matters similar to the instant case, we reiterate that the Commission cannot legitimately exercise jurisdiction over Southern Union unless Southern Union properly falls within the Commission's statutorily defined jurisdiction. We are not obligated to enforce, nor should we enforce a pattern of erroneous jurisdictional determinations in order to achieve consistency in the Commission's assertion of jurisdiction. *Cf. Environmental Improvement Bd.,* 89 N.M. at 227, 549 P.2d at 642. The rule prohibiting the Commission from departing from past practice absent prior notice does not apply to jurisdictional determinations. *Cf. Hobbs Gas Co. v. New Mexico Pub. Serv. Comm'n,* 115 N.M. 678, 684, 858 P.2d 54, 62 (1993) (holding Commission could not depart from past practice absent notice to utility which relied on past practice in context of ordered refund by gas utility). Thus, regardless of whether the Commission has previously asserted jurisdiction over cases of a similar nature, we must still find a statutory basis for allowing the assertion of jurisdiction in the instant case.

8. The Commission has jurisdiction only over entities functioning as public utilities. *See El Vadito de los Cerrillos Water Ass'n v. New Mexico Pub. Serv. Comm'n,* 115 N.M. 784, 788, 858 P.2d 1263, 1267

(1993). The Public Utility Act defines "public utility" as follows:

> **now [do] or hereafter** may own, operate, lease or control: . . .
>
> (2) any plant, property or facility for the manufacture, storage, distribution, sale or furnishing to or for the public of natural or manufactured gas or mixed or liquefied petroleum gas, or light, heat or power or for other uses.

NMSA 1978, § 62–3–3(G) (1993) (emphasis added). Furthermore, a public utility is one "affected with the public interest" and where "a substantial portion of their business . . . involves the rendition of essential public services to a large number of the general public." NMSA 1978, § 62–3–1(A)(1) (1967). This Court has found that the Commission lacked jurisdiction over parties who were not then operating as public utilities. *See, e.g.*, *El Vadito*, 115 N.M. at 789, 858 P.2d at 1268 (holding that Commission has no statutorily-conferred jurisdiction over a Sanitary Projects Act association found not to be operating as a public utility).

■ 9. Both parties agree that PNM falls within the jurisdiction of the Commission, having purchased all of Southern Union's gas utility assets in 1985 in order to furnish New Mexicans with gas. PNM is currently providing a basic public service by providing gas services to New Mexicans. By contrast, Southern Union ceased to be a public utility in 1985, following the sale of its gas utility assets to PNM. The Commission explicitly found that "[u]pon the granting of the abandonment of service by Southern Union, Southern Union is no longer a public utility and therefore our statutory authority over it ends." Neither party argues that Southern Union is currently functioning as a public utility. There are no applicable exceptions to this jurisdictional parameter which operate to extend the Commission's jurisdiction in the instant case. Given that Southern Union is not a public utility, the Commission erred in asserting jurisdiction over Southern Union. *See Llano, Inc. v. Southern Union Gas Co.*, 75 N.M. 7, 17, 399 P.2d 646, 654 (1964) (holding that the Commission lacked jurisdiction over company that did not *currently* fall within statutory definition of public utility).

■ 10. Southern Union next contends that regardless of whether it falls within the Commission's jurisdiction, the Commission has jurisdiction over the rate increase application. According to Southern Union, PNM's act of submitting the rate increase application conferred upon the Commission jurisdiction to consider the application. The source of the Commission's authority to consider a rate increase application submitted by a currently functioning public utility is found in Section 62–6–4(A) of the New Mexico Public Utility Act, which provides that "[t]he commission shall have general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates." NMSA 1978, § 62–6–4(A) (1996). We have previously noted that in order to grant a rate increase, the Commission must be convinced that the public utility actually incurred the costs for which the rate increase is intended to provide compensation. *See Attorney Gen. of N.M. v. New Mexico Pub. Serv. Comm'n*, 101 N.M. 549, 552, 685 P.2d 957, 960 (1984) (noting that Public Utility Commission's consideration of costs incurred by a public utility in assessing propriety of a rate-increase, requires, at a minimum, proof that public utility actually incurred those costs).

■ 11. In the instant case, there is no dispute that the relevant costs are those incurred by Southern Union as a direct result of the Southern Union/Unicon take-or-pay contracts. The findings of fact adopted by the Commission in response to the initial rate increase application indicate that PNM sought to "collect from customers certain costs incurred by its predecessor . . . Southern Union." According to the Commission, "[t]o the extent, the Commission allows these obligations to be recovered by [PNM] in rates, [PNM] will then be obligated to reimburse Southern Union." Southern Union, through the sales agreement approved by the Commission, explicitly retained liability for the costs it seeks to recuperate through this rate increase. We interpret the Public Utility Act to restrict the Commission's jurisdiction to consider rate increase applications to those instances where the public utility itself has incurred expenses, and hold that the

Commission does not have jurisdiction to consider rate increases for expenses incurred by an entity which is not a public utility, even when the rate increase application is submitted by a public utility.

### IV.

12. Southern Union is not a public utility over which the Commission may legitimately assert jurisdiction. Although the Commission has jurisdiction over rate increases requested by PNM, that jurisdiction does not extend to rate increases which would compensate an entity which is not currently a public utility for expenses it incurred in fulfilling its function as a public utility. Therefore, we affirm the Commission's dismissal with prejudice of PNM's rate increase application, based on the Commission's lack of jurisdiction over Southern Union and the particular rate increase requested.

13. **IT IS SO ORDERED.**

FRANCHINI, C.J., and SERNA, J., concur.

MINZNER and McKINNON, JJ., dissent and file opinions.

MINZNER, Justice, dissenting.

### I.

14. I respectfully dissent. I agree with Justice McKinnon that the decisive issue in this case is not Southern Union's current status as a public utility. The Public Service Company of New Mexico (PNM) applied for a rate increase based on expenses that could involve a matter of public concern and the reasonableness of current utility rates. The primary issue should be whether it is "necessary and convenient," NMSA 1978, § 62–6–4(A) (1993), for the Public Utility Commission (PUC) to evaluate those expenses in order to achieve a balance between ensuring "that reasonable and proper services shall be available at fair, just and reasonable rates, and ... that capital and investment may be encouraged and attracted...." NMSA 1978, § 62–3–1(B) (1967). I believe there are unresolved matters of fact which preclude a determination either that the PUC lacks sub-

ject matter jurisdiction or that the PUC can exercise its jurisdiction under the Act to consider the merits of this claim.

### II.

15. The Legislature has granted broad powers to the PUC in establishing and maintaining fair, just and reasonable rates. Section 62–6–4(A) (exclusive jurisdiction); *Behles v. New Mexico Pub. Serv. Comm'n (In re Timberon Water Co.),* 114 N.M. 154, 157, 836 P.2d 73, 76 (1992) ("[W]e must always keep in mind that 'the Commission is vested with considerable discretion in determining the justness and reasonableness of utility rates.'") (quoting *Attorney Gen. v. New Mexico Pub. Serv. Comm'n,* 101 N.M. 549, 553, 685 P.2d 957, 961 (1984)); *Public Serv. Co. of N.M. v. New Mexico Envtl. Improvement Bd.,* 89 N.M. 223, 227, 549 P.2d 638, 642 (Ct.App.1976). The PUC must act to protect the interests of both ratepayers and investors. *Behles,* 114 N.M. at 158, 836 P.2d at 77 ("'Our limited but vital role is to ensure that the end result of a rate order reasonably balances investor and ratepayer interests.'") (quoting *Jersey Central Power & Light Co. v. Federal Energy Reg. Comm'n,* 810 F.2d 1168, 1192 (D.C.Cir.1987)). Finally, the PUC may do whatever is necessary and convenient to balance those interests and to achieve the purposes of the Public Utility Act. Section 62–6–4(A).

16. It is true that the PUC's jurisdiction is limited to matters involving a public utility. Section 62–6–4(A). It is also true that Southern Union ceased to be a public utility under the Act upon its transfer of gas utility assets to PNM. *See* NMSA 1978, § 62–3–3(G) (1993) (defining "public utility"); *see also In re Southern Union Co.,* New Mexico Pub. Serv. Comm'n No. 1891/1892, at 51 (Final Order December 12, 1984) ("Upon the granting of the abandonment of service by Southern Union, Southern Union is no longer a public utility and therefore our statutory authority over it ends."). As a result, Southern Union is not subject to the reasonable burdens of the Act nor entitled to its reasonable benefits.

17. Nonetheless, the rate increase in this case was requested by a New Mexico public

utility, PNM, as defined in the Act by the Legislature. Section 62-3-3(G). Further, the requested increase concerns a possible utility-related expense for which the ratepayers may have received a benefit pursuant to an acquisition over which the PUC has jurisdiction. *See In re Southern Union Co.,* New Mexico Pub. Serv. Comm'n No. 1891/1892, at 62 (Final Order December 12, 1984) ("This Commission retains jurisdiction over this matter to the extent permitted by law *to assure compliance with all of the terms and conditions of this Order.*") (emphasis added).

18. The Legislature has specifically required PUC approval of any acquisition of a public utility. NMSA 1978, § 62-6-12 (1989). Pursuant to this power and its power over fixing and adjusting the rates of a utility, the PUC ascertains a utility's value by giving

due consideration to the history and development of the property and business of the particular public utility, to the original cost thereof, to the cost of reproduction as a going concern, to the revenues, investment and expenses of the utility in this state and otherwise subject to the commission's jurisdiction and to other elements of value and rate-making formulae and methods recognized by the laws of the land for rate-making purposes.

NMSA 1978, § 62-6-14(A) (1983).

19. In the acquisition of a public utility, a purchase agreement could contain both matters which are private or individual in nature and terms which affect the ratepaying public. The purchase price is a term that could represent mixed interests. In determining the value of a utility for purposes of fixing a fair and reasonable rate base, the PUC "shall give due consideration ... to the original cost" of a utility. Section 62-6-14; *Behles,* 114 N.M. at 157 n. 1, 836 P.2d at 76 n. 1. As a result, the purchase price is a potential matter of public concern. Nonetheless, the PUC "is not limited to any particular method of valuation in determining the rate base." *Behles,* 114 N.M. at 157 n. 1, 836 P.2d at 76 n. 1. If the PUC determines that the "original cost" does not accurately represent the value of the utility for ratemaking purposes or would not assist in fixing a reasonable

rate, the PUC is free to rely on other factors. *See Hobbs Gas Co. v. New Mexico Pub. Serv. Comm'n,* 94 N.M. 731, 733-34, 616 P.2d 1116, 1118-19 (1980) (discussing the factors available to the PUC in determining the value of a utility for purposes of ratemaking).

20. In PNM's acquisition of the utility from Southern Union, the excluded obligations term and the term obligating PNM to file regulatory applications for excluded obligations may have affected the purchase price. Considering the difficult and protracted nature of the acquisition agreement, Southern Union may not have agreed to the ultimate purchase price *and* the excluded obligations without the provision obligating PNM to file regulatory applications specifically for recovering costs incurred from the excluded obligations. It is possible that the PUC contemplated this in approving the acquisition. Further, with respect to the setting of rates charged by PNM, it is possible that the PUC, in balancing the interests of the consumers and the ratepayers, might rely on the purchase price in determining the value of the utility. Finally, it is possible that this particular expense, liability for take-or-pay claims, is utility-related and generally within the jurisdiction of the PUC. In fact, PNM's obligation to file for a rate increase was specifically limited to those expenses Southern Union "would have sought to recover" if it were still a public utility.

21. PNM's allegations, if true, would provide support for an exercise of jurisdiction by the PUC. Assuming PNM's lack of obligation for Southern Union's undetermined future liabilities resulted in PNM paying less to acquire the utility, and assuming the lower acquisition cost resulted in a lower rate base, the application would be based on utility-related expenses from which the ratepayers derived a benefit. The application then would lie squarely within the PUC's jurisdiction over utility rates. NMSA 1978, § 62-8-7 (1991) (discussing the procedure for rate changes); Section 62-6-4(A). However, because the PUC may determine the reasonableness of utility rates through a variety of means, it is also possible that this specific contractual term is purely a matter of private agreement and that it did not affect the

purchase price of the utility or otherwise concern the ratepaying public. *See Southwestern Pub. Serv. Co. v. Artesia Alfalfa Growers' Ass'n,* 67 N.M. 108, 117, 353 P.2d 62, 68 (1960) ("The power of the commission does not extend to acts of a utility not affecting its public duties; its jurisdiction is limited to matters and controversies wherein the rights of a utility and the public are involved.") (internal quotation and citation omitted). As a result, it is possible that the term of the acquisition contract providing the basis for this application has no relevance to PNM's rates as set by the PUC. *See Artesia Alfalfa Growers' Ass'n,* 67 N.M. at 118, 353 P.2d at 69 ("In this connection the question is posed as to whether the matter of dispute between appellant and appellee is of a private nature or a matter of public concern.").

22. The above discussion of purchase price does not represent the exclusive avenue of finding a valid exercise of jurisdiction by the PUC. Rather, it is meant to serve as an illustration of the type of factual inquiry which is required for a determination by the PUC of subject matter jurisdiction, considering the breadth of power granted by the Legislature to the PUC in its ratemaking function.

## III.

23. This claim raises factual issues which must be resolved before determining whether the PUC has subject matter jurisdiction over this action. In a motion to dismiss for lack of subject matter jurisdiction, the Attorney General stated, "There is absolutely no presentation of a utility expense, obligation or liability of GCNM–PNM that would justify a rate order by the Commission. . . ." The Attorney General's motion to dismiss could be construed as a challenge to the validity of the jurisdictional facts alleged by PNM. "[I]f the Rule 12(b)(1) motion is a factual attack on the jurisdictional allegations of the complaint—i.e., the truth of the jurisdictional facts alleged by the plaintiff is challenged—the court may receive any competent evidence, such as affidavits, deposition testimony and the like, in order to determine the factual dispute." 2A James Wm. Moore et al., *Moore's Federal Practice* ¶ 12.07[2.–1], at 12–52 (2d ed.1996).

24. Therefore, I would remand to the PUC for consideration of evidence in order to determine whether the PUC, under these facts, has jurisdiction under the Public Utility Act. Specifically, I believe the PUC should resolve the relevant factual issues relating to jurisdiction and determine whether the consideration of this rate increase application is necessary and convenient in the exercise of its jurisdiction over rates, acquisitions, and other matters included in the Public Utility Act. If, under this standard, the PUC determines that it has subject matter jurisdiction under the Act, it can then address the merits of the case and determine whether the requested rate increase would be fair, just, and reasonable. If the PUC determines that it does not have subject matter jurisdiction, it should make sufficient findings of fact and conclusions of law to permit effective appellate review.

McKINNON, Justice dissenting.

25. The decision of the majority that the Commission lacked subject matter jurisdiction to rule on Gas Company of New Mexico's (GCNM) rate application finds no support either in provisions of the Public Utility Act or decisions of this Court. The fact that Southern Union was not an operating utility at the time its successor, GCNM, applied for the rate increase on Southern Union's behalf is neither relevant to nor determinative of the jurisdictional issue. Given the legislature's mandate that we construe the Act liberally, NMSA 1978, § 62–3–2(B) (1985), that the Commission consider "the history and development of the property and business" of a public utility in the course of "fixing and setting of rates," § 62–6–14(A) (1983), and that the Commission must "do all things necessary and convenient" to ensure that rates are just and reasonable, § 62–6–4(A) (1993), the Commission had jurisdiction to rule on the merits of the application.

26. Prior to January 28, 1985, GCNM was owned and operated by Southern Union. (R.P. at 28.) On that date, Public Service Company of New Mexico (PNM) acquired the assets and business of GCNM, and now

owns and operates GCNM under the name PNM Gas Services. (R.P. at 28, 453.) Unicon Production Company sued PNM and Southern Union to recover $70 million allegedly owed under a 1954 gas purchase contract covering the period 1982 through 1988. (R.P. at 29.) In 1989, the parties settled for $11.7 million, or 17 cents on the dollar, which GCNM alleges was well below the average of similar settlements made at that time. (R.P. at 111.) Southern Union agreed to pay its proportionate share of the settlement costs for the pre-January 28, 1985 period, during which it owned GCNM, and PNM agreed to pay the balance for the period after January 28, 1985. (R.P. at 29–30.) According to GCNM, this settlement allowed Southern Union to avoid the legal fees, exposure to substantial liability, and uncertainty that a trial would have entailed. (R.P. at 112.) GCNM alleges that Southern Union exercised prudent business judgment in settling with Unicon, (R.P. at 114), and that the agreement benefitted New Mexico ratepayers, (R.P. at 43, 46, 116), because Unicon would not have settled its post–1985 claims with PNM without inclusion of the pre–1985 claims against Southern Union, (R.P. at 43).

27. In ruling on the motions to dismiss, the Commission construed the challenge to subject-matter jurisdiction as a facial challenge, (R.P. at 455), *see* 2A James W. Moore et al., Moore's Federal Practice ¶ 12.07[2.–1] at 12–50 to –52 (2d ed. 1996) (distinguishing facial challenges to subject-matter jurisdiction from factual challenges), and consequently accepted as true GCNM's allegations, (R.P. at 455). *See also* NMPUC Rule 110.25 (providing for dismissal for lack of jurisdiction). On review, we must accept all of GCNM's material factual allegations as true and "view them, along with all reasonable inferences therefrom, in the light most favorable to [GCNM]." *Freiburger v. Emery Air Charter, Inc.*, 795 F.Supp. 253, 257 (N.D.Ill.1992). *See also Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) ("[I]n passing on a motion to dismiss ... on the ground of lack of jurisdiction over the subject matter, ... the allegations of the complaint should be construed favorably to the pleader."); *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir.1995)

(same). The majority utterly fails to acknowledge, much less apply, this fundamental legal principle.

28. According to GCNM's application, the costs for which it sought recovery were incurred when GCNM was owned by Southern Union and regulated by the Commission. GCNM also alleges these costs were incurred while providing public utility services to New Mexico ratepayers. The majority suggests these facts are irrelevant and emphasizes that Southern Union does not now meet the statutory definition of "public utility." *See* § 62–3–3(G) (1993). This emphasis, however, is misplaced. The issue is not whether Southern Union is currently a public utility, which it clearly is not. The issue is whether these costs were incurred by a public utility regulated by the Commission. Under Section 62–3–3(G), Southern Union was a public utility subject to the Commission's authority when these costs were allegedly incurred. Not only does the majority's resolution confuse personal jurisdiction with subject-matter jurisdiction, *see* Moore's, *supra*, ¶ 12.07[2.–1] 12–48 to –67, [2.–2] 12–68 to –77, it runs counter to express provisions in the Act.

29. The Act gives the Commission broad authority to consider an application to recover costs incurred in the course of providing utility services. *See* § 62–6–4(A) (granting the Commission "general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates and service regulations ... and to do all things necessary and convenient in the exercise of its power and jurisdiction"); § 62–3–2(B) (mandating liberal construction of the Act "to carry out its purpose"); *Public Serv. Co. of N.M. v. New Mexico Envtl. Imp. Bd.*, 89 N.M. 223, 227, 549 P.2d 638, 642 (Ct.App. 1976) (requiring that the Commission's authority be construed to permit the fullest accomplishment of legislative intent or policy). Insofar as GCNM seeks recovery for utility expenses that allegedly benefitted New Mexico ratepayers, the Commission is required to exercise its jurisdiction and consider the merits of the application. The majority, however, construes the Commission's authority narrowly, thwarting the purpose of the Act: to ensure that "reasonable and

proper services ... are available at fair, just and reasonable rates," § 62–3–1(B) (1967). *See also* § 62–8–1 (1941) (requiring that every rate be "just and reasonable").

30. The Act requires the Commission to consider the fact that Southern Union was the owner of GCNM when these costs were incurred. *See* § 62–6–14(A) ("[I]n the fixing and setting of rates for a utility, the commission shall give due consideration to the history and development of the property and business of the particular public utility.…"). The Commission must also balance the interests of GCNM's customers against the interests of Southern Union's shareholders. *See Behles v. New Mexico Pub. Serv. Comm'n,* 114 N.M. 154, 161, 836 P.2d 73, 80 (1992) (requiring Commission to "balance the investor's interest against the ratepayer's interest"). The Commission neither considered the history of GCNM nor balanced these interests. The majority's affirmance allows the Commission to evade these statutory responsibilities by declaring it lacks jurisdiction.

31. Despite the broad language chosen by the legislature, the majority holds that the Commission has jurisdiction only over entities which function presently as public utilities, and since Southern Union ceased functioning as a public utility in 1985, the Commission has no jurisdiction to rule on GCNM's application. (Op. at ¶¶ 8–9.) In support of the holding, the majority cites three decisions of this Court, not one of which holds that jurisdiction is lacking where a previously regulated utility's claim is handled by a successor. *See El Vadito de los Cerrillos Water Ass'n v. New Mexico Pub. Serv. Comm'n,* 115 N.M. 784, 858 P.2d 1263 (1993); *Llano, Inc. v. Southern Union Co.,* 75 N.M. 7, 399 P.2d 646 (1964); *Attorney Gen. of N.M. v. New Mexico Pub. Serv. Comm'n,* 101 N.M. 549, 685 P.2d 957 (1984) (hereinafter *"Attorney General"*).

32. In *El Vadito,* 115 N.M. at 788, 858 P.2d at 1267, we considered whether Sanitary Projects Act (SPA) associations, which were extensively regulated by the New Mexico Environmental Improvement Division of the Health and Environment Department (NMEID), should be *concurrently regulated* by the Commission. Because the SPA grants control of these associations to the NMEID, *id,* at 788–89, 858 P.2d at 1267–68, and because of the "impractical[ity]" of concurrent jurisdiction, *id.* at 789 n. 2, 858 P.2d at 1268 n. 2, we held that the Commission lacked jurisdiction over SPA associations. The only question decided in *El Vadito* was whether the Commission would *ever* have jurisdiction over SPA associations, which is hardly the issue presented here.

33. In *Llano,* 75 N.M. at 9, 399 P.2d at 647, the question was whether a company that provides natural gas to only one private customer is a public utility. We held that it was not. *Id.* at 18–19, 399 P.2d at 653–54. Clearly *Llano*'s holding does not bar the Commission from considering GCNM's application, because GCNM is a public utility. Nor does it preclude GCNM from seeking recovery for expenses incurred under its previous owner, Southern Union, which was regulated by the Commission when the costs were allegedly incurred. The majority's decision is certainly not assisted by the holding in *Llano.*

34. Finally, the majority cites *Attorney General, supra,* in which PNM sought a rate increase to recover the cost of purchasing coal from an affiliate, 101 N.M. at 551, 685 P.2d at 959. The issue was whether these costs were reasonable, and we held that they were. *Id.* We also noted that a utility seeking recovery for costs incurred in transactions with its affiliates must show not only that the costs were incurred; it must also prove they were reasonable. *Id.* at 552, 685 P.2d at 959. The issue in *Attorney General* had nothing to do with the scope of the Commission's jurisdiction. Accordingly, the decision provides no support for the majority's claim that the Commission's *jurisdiction* to consider rate increase applications may be exercised only in those instances where the public utility applying for the rate increase has itself incurred the costs.

35. Nothing in the Act or any of these cases precludes the Commission from considering an application simply because the costs were incurred prior to the sale of the applicant public utility to its current owner. We have never held that a public utility must

show that it, as opposed to its predecessor, incurred the costs for which it seeks recovery *in order to invoke the Commission's jurisdiction.* On the contrary, the Act *requires* the Commission to consider the history of a public utility in setting rates. *See* § 62–6–14(A). If the Commission, after reviewing GCNM's request on the merits, were to decide that the evidence does not justify a rate increase, that is the Commission's prerogative. But to decline to exercise *jurisdiction* because the rate increase is designed to compensate for expenses GCNM incurred while under the ownership of a company no longer operating as a public utility is without precedent and contravenes the legislature's intent as expressed in the Act.

36. It is indeed ironic that the Commission would now assert it lacks jurisdiction to consider this application. The Commission *expressly approved* the Purchase and Sale Agreement transferring ownership of GCNM from Southern Union to PNM. *See* § 62–6–12(A) (1989) (requiring the Commission's "prior express authorization" for such transactions). That agreement obligated PNM to pursue on Southern Union's behalf recovery for expenses "which Southern Union reasonably determines it would have sought to recover through such regulatory applications and proceedings had Southern Union owned [GCNM]." (PSA § 2.4 at 6.) Furthermore, the Commission also stated it had subject-matter jurisdiction to consider GCNM's original application on Southern Union's behalf.[1]

37. To the extent that this case involves issues of the proper balance of the interests of ratepayers and investors and whether current rates are just and reasonable, consideration of GCNM's application falls squarely within the Commission's jurisdiction. *See* § 62–3–1(B); *Behles,* 114 N.M. at 161, 836 P.2d at 80. Therefore, I would vacate and annul the Commission's order dismissing the application and remand for findings of fact and conclusions of law on the merits. The

majority having determined otherwise, I dissent.

---

1. GCNM applied for this rate increase in Commission Case No. 2361. The Commission dismissed the application *without prejudice* for failure to meet the burden of proof and expressly stated it "has jurisdiction over the parties and the subject matter of this case." (S.R.P. Tab 7A at 2.) GCNM filed this amended application in Commission Case No. 2639, which seeks the same relief and involves the same parties.