# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2021-NMCA-005**

**Filing Date: October 15, 2020**

**No. A-1-CA-36398**

**SOUTHWEST ORGANIZING PROJECT,
ESTHER ABEYTA, and STEVEN
ABEYTA,**

        Plaintiffs-Appellants,

v.

**ALBUQUERQUE-BERNALILLO
COUNTY AIR QUALITY CONTROL
BOARD,**

        Defendant-Appellee,

and

**CITY OF ALBUQUERQUE
ENVIRONMENTAL HEALTH
DEPARTMENT,**

        Intervenor-Appellee.

**APPEAL FROM THE ALBUQUERQUE-BERNALILLO COUNTY AIR QUALITY
CONTROL BOARD**
**Kelsey Curran, Vice Chair**

Released for Publication March 9, 2021.

New Mexico Environmental Law Center
Eric Jantz
Douglas Meiklejohn
Jaimie Park
Jonathan Block
Santa Fe, NM

for Appellants

Felicia L. Orth
Los Alamos, NM

Lorenz Law
Alice Tomlinson Lorenz
Albuquerque, NM

for Defendant-Appellee

Atler Law Firm, P.C.
Timothy J. Atler
Albuquerque, NM

City of Albuquerque
Samantha Hults, Acting City Attorney
Carol M. Parker, Assistant City Attorney
Albuquerque, NM

for Intervenor-Appellee

New Mexico Environment Department
Lara Katz, Assistant General Counsel
Andrew Knight, Assistant General Counsel
Santa Fe, NM

for Amicus Curiae New Mexico Environment Department

Montgomery & Andrews, PA
Louis W. Rose
Matthew A. Zidovsky
Santa Fe, NM

for Amicus Curiae New Mexico Association of Commerce and Industry

**OPINION**

**B. ZAMORA, Judge.**

{1}     This is an appeal of the Albuquerque-Bernalillo County Air Quality Control Board's (the Board) order upholding the City of Albuquerque Environmental Health Department's (EHD) issuance of an authority-to-construct permit to Honstein Oil & Distributing, LLC, pursuant to the New Mexico Air Quality Control Act (the AQCA), NMSA 1978, §§ 74-2-1 to -17 (1967, as amended through 2019). SouthWest Organizing Project, Esther Abeyta, and Steven Abeyta (collectively, SWOP) contend that (1) the Board erred in upholding EHD's issuance of the permit because EHD failed to apply a "reasonable probability of injury" standard when evaluating the permit; (2) the Board and EHD violated the AQCA's public participation provisions by failing to consider quality of life impacts and non-technical testimony from public participants; (3) the Board's hearing officer allowed overly burdensome and prejudicial discovery; and (4)

the Board's hearing officer applied the rules of evidence in a manner contrary to the Board's adjudicatory regulations. We affirm.

## BACKGROUND

### I. Air Pollution Regulatory and Enforcement Authorities and Statutory Schemes

**{2}** The United States Environmental Protection Agency (the EPA) regulates the emission of airborne pollutants through the Clean Air Act, 42 U.S.C. §§ 7401-7671 (2018). Under the Act's provisions, the EPA is charged with identifying air pollutants and establishing national ambient air quality standards. 42 U.S.C. §§ 7408-7409. In contrast, the individual states are charged with implementing and enforcing EPA standards and rules at the local level to prevent and abate air pollution. *See* 42 U.S.C. § 7407(a) (stating that "[e]ach State shall have the primary responsibility for assuring air quality within [its] entire geographic area"); 42 U.S.C. § 7401(a)(3) ("[A]ir pollution prevention . . . is the primary responsibility of [s]tates and local governments[.]"). The Clean Air Act requires states to promulgate local regulations implementing and enforcing its provisions through a "[s]tate implementation plan." *See* 42 U.S.C. § 7410. New Mexico adopted the AQCA as part of such a plan. *See* § 74-2-2(V); 40 C.F.R. § 52.1640(c)(2) (2011); 42 U.S.C. § 7410.

**{3}** Pursuant to the terms of the AQCA, counties and municipalities that meet certain qualifications "may assume jurisdiction as a local authority by adopting an ordinance providing for the local administration and enforcement of the [AQCA]." Section 74-2-4(A). Local authorities adopting such an ordinance must create two separate entities: a local board vested with rule-making authority, and a local agency or department charged with administering the rules and regulations promulgated by the board. Sections 74-2-4(A), -5(B). Within the City of Albuquerque and Bernalillo County, the Board fulfills the role of local board and EHD serves as the local agency or department. *See* 20.11.81.7(E), (G) NMAC; Bernalillo County, N.M., Code, art. II, §§ 30-31 to -47 (2020); Albuquerque, N.M., Rev. Ordinances ch. 9, art. V, §§ 9-5-1-1 to -99 (1996).

**{4}** As part of its enforcement duties, EHD is charged with granting or denying requests from entities and persons seeking "construction permit[s]" to emit various pollutants. Section 74-2-7(A)(1). If a person who participated in the permitting action is adversely affected by EHD's decision to grant or deny a permit application, that person may bring a petition against EHD before the Board. *See* § 74-2-7(G)-(J). EHD must respond to the petition and defend its action before the Board and/or a designated hearing officer. 20.11.81.14(D) NMAC; *see also* § 74-2-7(J) (allowing the Board to designate a hearing officer to hold a hearing, take evidence, and make a recommendation on the disposition of the petition).

## II.     The Honstein Plant

**{5}**     Honstein owns and operates a bulk gasoline plant that releases volatile organic compounds, a class of hazardous air pollutants. The plant was constructed in the 1920's, before enactment of the Clean Air Act and AQCA. *See* 42 U.S.C. §§ 7401 to 7671 (enacted in 1955); §§ 74-2-1 to -17 (enacted in 1967). Pursuant to regulations promulgated by the Board in accordance with the provisions of the AQCA, Honstein must have a valid air quality permit in order to operate the plant. *See generally* 20.11.64 NMAC; 20.11.65 NMAC. Prior to 2013, Honstein operated the plant without a permit. In 2013 after receiving a complaint from a concerned citizen regarding the plant's unpermitted status, EHD required Honstein to file an application for a stationary source air quality authority-to-construct permit.

**{6}**     Prior to deciding on the application in this case, EHD issued a public notice regarding the permit, which detailed the procedures and deadlines for submitting comments and requesting a public hearing. It also provided notice of the pending application to nearby neighborhood associations, the New Mexico Environment Department (NMED), and the EPA. At the request of several individuals, including members of SWOP, EHD scheduled a public hearing and solicited public comments. After reviewing the evidence adduced at the public hearing, EHD granted Honstein's permit application, finding that the permit met all regulatory requirements and that "[n]one of the public comments established that the Honstein Oil facility would violate any regulations or requirements, would cause or contribute to an exceedance of an ambient air quality standard, or would violate any other provision of the [AQCA] or the Clean Air Act." On June 12, 2014, EHD issued a permit to Honstein.

**{7}**     SWOP filed a petition with the Board challenging EHD's approval and issuance of the permit. The Board designated a hearing officer to preside over the required adjudicatory hearing. During the adjudicatory hearing in January 2017, SWOP offered technical testimony from three witnesses. The hearing officer also accepted public comment from twenty-four people during the three-day adjudicatory hearing. The hearing officer issued proposed findings of facts and conclusions of law, finding that SWOP had "not carried their burden of proof to show that the Honstein Oil facility would violate applicable standards, rules or requirements of the [AQCA] or the Clean Air Act" and recommending that the permit be upheld as issued. The Board unanimously adopted the hearing officer's findings of fact and conclusions of law and upheld the permit as issued. SWOP appeals.[1]

## DISCUSSION

**{8}**     On appeal, SWOP argues that (1) the Board erred in upholding EHD's issuance of the permit because EHD failed to apply a "reasonable probability of injury" standard when evaluating the permit; (2) the Board and EHD violated the AQCA's public participation provisions by failing to consider quality of life impacts and non-technical

---

1On appeal, EHD intervened and NMED and the New Mexico Association of Commerce and Industry filed amicus curiae briefs in support of the Board's decision.

testimony from public participants; (3) the Board's hearing officer allowed overly burdensome and prejudicial discovery; and (4) the Board's hearing officer applied the rules of evidence in a manner contrary to the Board's adjudicatory regulations.[2] We address each argument in turn.

## I. Standard of Review

**{9}** This Court has jurisdiction to review an appeal taken by "[a]ny person adversely affected by an administrative action" by the Board. Section 74-2-9(A). We will only set aside the action of the Board if its decision was "(1) arbitrary, capricious, or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Section 74-2-9(C). "A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." *Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806. Interpretation of the AQCA is a question of law that we review de novo. *See N.M. Att'y Gen. v. N.M. Pub. Regul. Comm'n*, 2013-NMSC-042, ¶ 10, 309 P.3d 89.

## II. The Board's Obligation to Abate Air Pollution, as Defined in Section 74-2-2(B), Does Not Establish an Independent Standard Applicable to the Permitting Process

**{10}** SWOP argues that the Board erred in upholding EHD's decision because neither the Board nor EHD considered whether there was a reasonable probability that emissions from the Honstein plant might "cause injury to human health or property, either alone or in combination with other air pollution sources." SWOP extrapolates this reasonable probability of injury standard from Section 74-2-2(B) of the AQCA which defines "air pollution" as

> the emission, except emission that occurs in nature, into the outdoor atmosphere of one or more air contaminants in quantities and of a duration that may *with reasonable probability injure human health or animal or plant life or as may unreasonably interfere with the public welfare, visibility or the reasonable use of property*[.]

*Id.* (emphasis added). SWOP argues that the plain language of this provision requires EHD to apply the reasonable probability of injury standard when considering whether to grant a permit, and similarly requires the Board to apply the standard when reviewing EHD decisions. We disagree.

**{11}** When presented with a question of statutory construction, we observe the following general principles: (1) "the plain language of a statute is the primary indicator

---

2SWOP also argues the Board improperly shifted the burden of proof from EHD onto the community. We disagree. The AQCA provides that a petitioner adversely affected by the issuance of a permit has the burden of proof. Section 74-2-7(H), (K). Thus, the Board did not improperly shift the burden to SWOP in upholding EHD's decision to issue the permit, and we need not address this argument further.

of legislative intent" and we "give the words used in the statute their ordinary meaning unless the [L]egislature indicates a different intent"; (2) we "will not read into a statute or ordinance language which is not there, particularly if it makes sense as written"; (3) we will "give persuasive weight to long-standing administrative constructions of statutes by the agency charged with administering them"; and (4) when "several sections of a statute are involved, they must be read together so that all parts are given effect." *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (internal quotation marks and citations omitted).

{12}    We begin our analysis with an overview of the statutory structure of the AQCA. In addition to Section 74-2-2(B), which defines "air pollution," two additional sections are relevant to our analysis—Sections 74-2-5 and 74-2-7. Section 74-2-5 of the AQCA sets forth the Board's rulemaking authority, requiring the Board to "adopt, promulgate, publish, amend and repeal rules and standards consistent with the [AQCA] to attain and maintain national ambient air quality standards and prevent or abate air pollution[.]" Section 74-2-5(B)(1). Thus, on its face, Section 74-2-5(B)(1) requires the Board to exercise its rulemaking authority to prevent or abate "emission . . . into the outdoor atmosphere of one or more air contaminants in quantities and of a duration that may with reasonable probability injure human health or animal or plant life or as may unreasonably interfere with the public welfare, visibility or the reasonable use of property[.]" Section 74-2-2(B) (defining "air pollution"). In other words, the Board must determine which quantities and durations of air contaminants may, with reasonable probability, cause injury. Only after defining such quantities and durations can the Board use its rulemaking power to accomplish the legislative mandate of preventing or abating air pollution.[3] This interpretation is consistent with further instructions contained in Section 74-2-5 providing that the Board "shall give weight it deems appropriate to all facts and circumstances, including but not limited to" the "character and degree of injury to or interference with health, welfare, visibility and property." Section 74-2-5(E)(1); *see also* § 74-2-5(B)(2) (requiring the Board to consider the "differences, needs, requirements and conditions within the geographic area of the . . .[B]oard's jurisdiction" in "adopt[ing] a plan for the regulation, control, prevention or abatement of air pollution").

{13}    We now turn to Section 74-2-7. While we agree that the Board must apply the reasonable probability of injury analysis when engaging in rulemaking, SWOP's assertion that the Board and EHD are required to apply the reasonable probability definition of air pollution as an independent consideration in the context of approving or denying individual permits is refuted by the language of Section 74-2-7, which governs the permit process. Section 74-2-7 requires the Board and EHD to confirm "that regulations and standards under the [AQCA] or the federal act will not be violated" if a permit is issued. Section 74-2-7(B)(1). These federal regulations and standards explicitly define when a permit should be issued and what rules and regulations must be followed by operators of sources emitting air pollution. *See, e.g.*, 20.11.64.6 NMAC (adopting "specified federal National Emissions Standards for Hazardous Air Pollutants (NESHAP) and National Emissions Standards for Hazardous Air Pollutants for Source

---

[3]SWOP does not challenge any exercise of the Board's rulemaking authority in this appeal.

Categories codified at 40 C.F.R. §§ 61 and 63"); 40 C.F.R. § 63.11086 (2011) (setting out requirements for bulk gasoline plant facilities).

**{14}**    Significantly, broad language instructing the Board to "prevent or abate air pollution" as in Section 74-2-5, is notably absent from Section 74-2-7. *See State v. Oppenheimer & Co.*, 2019-NMCA-045, ¶ 15, 447 P.3d 1159 ("[W]hen the Legislature includes a particular word in one portion of a statute and omits it from another portion of that statute, such omission is presumed to be intentional." (internal quotation marks and citation omitted)). Section 74-2-7 does mention "air pollution," but only once, and only obliquely, through reference to local, state, and federal standards and regulations. *See* § 74-2-7(L) ("[A] final decision on a permit by the department, the environmental improvement board, the local agency, the local board or the [C]ourt of [A]ppeals that a source will or will not meet applicable local, state and federal air pollution standards and regulations shall be conclusive."). Section 74-2-7 does not employ "air pollution" as the term is defined in Section 74-2-2(B); it merely references the local, state, and federal air pollution standards and regulations. *See* § 74-2-7(L). Section 74-2-7(L) then directs EHD (and the Board if EHD's decision is petitioned) to determine whether any such standards or regulations are violated, but does not impose a separate duty to determine whether granting the permit will cause "emission . . . into the outdoor atmosphere of one or more air contaminants in quantities and of a duration that may with reasonable probability injure human health or animal or plant life or as may unreasonably interfere with the public welfare, visibility or the reasonable use of property[.]" Section 74-2-2(B). Thus, the language of Section 74-2-7 does not impose on EHD or the Board a requirement to independently apply the reasonable probability of injury standard when considering whether to grant a permit.

**{15}**    We next address SWOP's argument that EHD must separately consider the reasonable probability of injury standard before issuing a permit based on our Supreme Court's holding in *Duke City Lumber Co. v. New Mexico Environmental Improvement Board*, 1984-NMSC-042, 101 N.M. 291, 681 P.2d 717. In that case, the Court held that "[t]he Board has power under the [AQCA] to deny [a] variance when the air pollution that would result from granting a variance would with 'reasonable probability' injure health." *Id.* ¶ 17 (emphasis omitted). *Duke City Lumber* is distinguishable on its facts; our Supreme Court analyzed the applicability of the reasonable probability of injury standard in the context of a variance proceeding under Section 74-2-8 of the AQCA, not in the context of the permitting process under Section 74-2-7 of the AQCA. *Duke City Lumber*, 1984-NMSC-042, ¶ 2. As EHD points out, Section 74-2-8 sets forth the procedure for granting exceptions to the standards and limitations prescribed under the AQCA or its regulations and specifically calls for the Board to consider whether the variance would pose a risk of harm to the community's health or safety. *See* § 74-2-8(A)(2)(a) (stating that a variance may be granted if it "will not . . . result in a condition injurious to health or safety"). Logically, this makes sense. Because the Board must take into account the reasonable probability of injury standard when exercising its rulemaking power as required by Section 74-2-5, any request to deviate from those regulations has the potential to produce quantities and duration of emissions that would result in a reasonable probability of injury. Accordingly, Section 74-2-8 contains statutory language

requiring EHD (and the Board if EHD's decision is petitioned) to take a second look at whether granting the variance has a reasonable probability to injure health. *See Duke City Lumber*, 1984-NMSC-042, ¶ 2. SWOP asks us to expand the reasoning from *Duke City Lumber* to the permitting process even though Section 74-2-7 of the AQCA contains no similar statutory language. *See generally* § 74-2-7 (delineating the process for obtaining construction and operating permits pursuant to the AQCA and defining the requirements and limitations the local agency and board must rely on to grant, deny, or modify a construction permit). Given the absence of any express language requiring the Board or EHD to separately consider health or safety concerns during the permitting process defined in Section 74-2-7, we decline to expand the reasoning from *Duke City Lumber* to the permitting process.

**{16}**    Finally, SWOP argues that Section 74-2-7(C)(1)(a), which permits EHD to deny a permit if it "will not meet applicable standards, rules or requirements of the [AQCA] or the [Clean Air Act]"; and Section 74-2-5(A), which generally requires the Board to "prevent or abate air pollution," when taken together, require imposition of the reasonable probability of injury standard to the permitting process. SWOP's argument is flawed because it presumes that the only way the Board or EHD can prevent or abate air pollution is by independently applying the reasonable probability of injury standard at both the rulemaking and enforcement steps. But, as we previously explained, the Board and EHD prevent and abate air pollution through the adoption and enforcement of local, state, and federal air quality standards and regulations, which were created in part by giving due consideration to the reasonable probability of injury standard. *See Pub. Serv. Co. of N.M. v. N.M. Env't Improvement Bd.*, 1976-NMCA-039, ¶¶ 7-8, 89 N.M. 223, 549 P.2d 638 (noting that the environmental improvement board adopted ambient air quality standards to comply with its mandate that it shall prevent or abate air pollution).

**{17}**    For the foregoing reasons, we conclude that SWOP has not established that the Board erred in upholding EHD's decision rendered without application of the reasonable probability of injury standard during the permitting process. Having pointed to no other error demonstrating that the Board or EHD failed to consider its mandate under Section 74-2-7, we hold that the Board did not act in a manner that was arbitrary, capricious, or contrary to law when it affirmed EHD's issuance of Permit No. 3131.

### III.    Public Participation Was Properly Considered

**{18}**    We next address SWOP's argument that EHD, during the application process, and the Board, at the later adjudicatory hearing, were required to consider community testimony regarding the Honstein plant's effect on local resident quality of life. SWOP relies primarily on *Colonias Development Council v. Rhino Environmental Services Inc.* (*Rhino*), 2005-NMSC-024, 138 N.M. 133, 117 P.3d 939, to support its argument. In *Rhino*, our Supreme Court held that the NMED must (1) allow public testimony about a proposed landfill's adverse impact on a community's quality of life when reviewing a permit application; and (2) consider or address such public testimony in coming to a determination regarding whether to grant or deny a permit. *Id.* ¶¶ 1-2, 24, 26, 29. The Court rejected the argument that the hearing officer "was not allowed to consider"

evidence and testimony relating to social impact and quality of life issues. *Id.* ¶¶ 20, 24. Similarly, the Court rejected the argument that the Secretary was prohibited from considering non-technical testimony. *Id.* ¶ 24. As the Court explained,

> The Legislature did not require scientific evidence in opposition to a landfill permit, but instead envisioned that ordinary concerns about a community's quality of life could influence the decision to issue a landfill permit. While testimony relating to something as broad as "social impact" may not require denial of a permit, the hearing officer must listen to concerns about adverse impacts on social well-being and quality of life, as well as report them accurately to the [s]ecretary. In reviewing the hearing officer's report, the [s]ecretary must consider whether lay concerns relate to violations of the Solid Waste Act and its regulations.

*Id.* The Court was careful however to caution that the secretary's "authority to *address* [a community's quality of life] concerns requires a nexus to a regulation." *Id.* ¶ 29 (emphasis added). The Court concluded that such a nexus existed because the regulations implementing the Solid Waste Act direct the secretary to issue a permit if the applicant fulfills the technical requirements *and* "the solid waste facility application demonstrates that neither a hazard to public health, welfare, or the environment nor undue risk to property will result." *Id.* ¶ 31 (quoting 20.9.1.200(L)(10) NMAC (11/27/2001)); *see also* NMSA 1978, § 74-9-24(A) (2011) (directing that the secretary "may deny a permit application on the basis of information in the application or evidence presented at the hearing, or both, if the director makes a finding that granting the permit would be contradictory to or in violation of the Solid Waste Act or any regulation adopted [under it]").

{19}    Turning to the AQCA, we review its provisions to determine whether EHD and the Board must allow public testimony regarding adverse impacts on a community's quality of life when reviewing a permit application, and whether EHD and the Board must consider or address such public testimony in coming to a determination regarding whether to grant or deny a permit.

{20}    Similar to the Solid Waste Act, the AQCA is "replete with references to public input." *Rhino*, 2005-NMSC-024, ¶ 21. Section 74-2-7(I) of the AQCA provides,

> If the subject of the petition is a permitting action deemed by the environmental improvement board or the local board to substantially affect the public interest, the environmental improvement board or the local board shall ensure that the public receives notice of the date, time and place of the hearing. The public in such circumstances shall also be given a reasonable opportunity to submit data, views or arguments orally or in writing and to examine witnesses testifying at the hearing. Any person submitting data, views or arguments orally or in writing shall be subject to examination at the hearing.

*See also* 20.11.81.14(I)(2)(a)-(b) NMAC (stating that any member of the general public may testify at the adjudicatory hearing in support of or in opposition to the petition without prior notice). From these provisions it is clear that public comment must be permitted in connection with matters that substantially affect public interest, and, more specifically, must be permitted at any adjudicatory hearing.[4] Accordingly, we agree that EHD and the Board must permit public testimony regarding potential adverse impact on a community's quality of life during the permitting process.

**{21}** Reviewing the record, EHD and the Board met this requirement. During the initial application process, EHD held a public information hearing, accepted public testimony about concerns for quality of life, and addressed written comments submitted before and during the hearing. During the hearings following petition of EHD's decision to grant the permit, the Board similarly permitted public testimony and provided a two-hour session outside working hours to accommodate additional public testimony. In total, twenty-four people testified regarding the Honstein plant's effects on the public's quality of life over the course of the three-day hearing.

**{22}** Next, we determine whether EHD and the Board were authorized to *address* public commentary regarding quality of life impacts in coming to a decision regarding whether to grant or deny a permit. As in *Rhino*, we examine whether quality of life evidence and testimony share a nexus with the AQCA and its attendant regulations. *See* 2005-NMSC-024, ¶ 29. In *Rhino*, our Supreme Court drew a distinction between (1) general expressions of the legislative police power and the overall goals and aims of the Solid Waste Act; and (2) more specific guidance espoused in regulations dealing with permit issuance. *Id.* ¶¶ 29-31. In discussing the general provisions of the Solid Waste Act, the Court held that such statements fail to establish a statutory mandate to consider sociological and quality of life impact concerns.

> [W]e are not persuaded that the general purposes of the Environmental Improvement Act and the Solid Waste Act, considered alone, provide authority for requiring the [s]ecretary to deny a landfill permit based on public opposition. The purposes of the enabling acts, which include the goal of protecting the "public health, safety and welfare," are designed to invoke the general police power of the state. This general expression of legislative police power, without more, does not create a standard for protecting "public health, safety and welfare."

*Id.* ¶ 29 (citations omitted).

**{23}** In contrast, the Court was persuaded that specific references in the regulations implementing the Solid Waste Act required consideration of evidence and testimony

---

4We note that these statutory and code provisions require public comment only at adjudicatory proceedings. "[A]djudicatory proceedings of the board . . . are proceedings in which the board makes final, binding determinations that directly affect legal rights[.]" 20.11.81.2(A) NMAC. We assume without deciding that public comment is also required in proceedings before EHD. The parties do not adequately address or brief the matter, and it does not affect our disposition in this case.

impacting quality of life during the permitting process. *Id.* ¶¶ 31-34. The applicable provisions require a permit to be issued only if "the solid waste facility application demonstrates that neither a hazard to public health, welfare, or the environment nor undue risk to property will result." 20.9.1.200(L)(10) NMAC (11/27/2001); *see also* 20.9.1.200(L)(16)(c) NMAC (11/27/2001) (providing that a specific cause for denying a permit application is a determination that "the permitted activity endangers public health, welfare or the environment"). The regulations also require all solid waste facilities to be located and operated "in a manner that does not cause a public nuisance or create a potential hazard to public health, welfare or the environment[.]" 20.9.1.400(A)(2)(a) NMAC (11/27/2001). The Court concluded, "[b]ecause the impact of the proliferation of landfills and industrial sites on a community is relevant to environmental protection, . . . the Solid Waste Act and its regulations require the Department to consider whether evidence of the harmful effects from the cumulative impact of industrial development rises to the level of a public nuisance or potential hazard to public health, welfare or the environment." *Rhino*, 2005-NMSC-024, ¶ 34.

**{24}**     Turning to the AQCA, we observe that specific guidance requiring consideration of quality of life impacts is conspicuously absent from its permitting provisions. SWOP argues again that the general definition of air pollution in Section 74-2-2(B), including language regarding the "reasonable probability" of injury standard, when coupled with the language in Section 74-2-5(A), indicating the Board "shall prevent or abate air pollution[,]" require the Board and EHD to *address* quality of life testimony and evidence. As in *Rhino*, we are not persuaded that the broad language contained in these "general purpose" provisions of the AQCA provide authority to grant or deny a permit "based on public opposition." *See Rhino*, 2005-NMSC-024, ¶ 29 ("Such a broad mandate would offer no guidance to the Department, and violate the well-settled principle that a legislative body may not vest unbridled or arbitrary power in an administrative agency."). Furthermore, SWOP has failed to direct us to any regulatory provision supplying the requisite nexus to quality of life evidence, nor have we uncovered any in our review of the applicable regulations. In absence of this, we conclude that EHD, during the application process, and the Board, at the later adjudicatory hearing, were not required to address public testimony regarding quality of life issues in resolving the permit application.[5]

---

5SWOP also argues that the hearing officer exerted a chilling effect on public participation by requiring participants in the hearing to abide by the New Mexico Rules of Evidence, and by permitting opposing counsel to "aggressively object and cross-examine" witnesses. SWOP contends that imposition of the rules of evidence and procedure "chilled public participation in violation of the . . . [our] Supreme Court's decision in *Rhino*." In *Rhino*, our Supreme Court held that the hearing officer erred when she prohibited a citizen, on relevance grounds, from asking Rhino's general manager whether Rhino had conducted any social impact studies. *See* 2005-NMSC-024, ¶¶ 8, 10, 43. The error committed by the hearing officer was a *misapplication of the rules of evidence and procedure*; the Court concluded that social impact testimony and evidence was relevant. *Id*. ¶ 30. SWOP cites no authority supporting its contention that mere imposition of rules by a hearing officer chills participation in a public hearing, and this argument is refuted by regulations permitting imposition of such rules. *See* 20.11.81.12(A) NMAC (stating that, where no other provision specifically governs, a local board or the board's hearing officer may look to the New Mexico Rules of Civil Procedure and New Mexico Rules of Evidence). With respect to the argument that the hearing officer erred by allowing opposing counsel to "aggressively object and cross-examine"

## IV.    The Hearing Officer Did Not Err in Issuing a Discovery Order

**{25}**    We next address SWOP's argument that the Board's hearing officer acted arbitrarily, capriciously, and not in accordance with the Board's regulations in issuing a discovery order. Prehearing discovery in a proceeding before the Board is permitted when the hearing officer determines that "(a) the type of discovery sought will not unreasonably delay the proceeding and is not unreasonably burdensome or unreasonably expensive; and (b) the information to be obtained is relevant and is not otherwise reasonably obtainable, or may be lost, or may become unavailable." 20.11.81.14(J)(1) NMAC. The Board's regulations also indicate that "[d]iscovery shall be guided by the provisions of the New Mexico [R]ules of [C]ivil [P]rocedure in effect at the time of the hearing." 20.11.81.14(J) NMAC.

**{26}**    SWOP argues that the hearing officer violated 20.11.81.14(J)(1) NMAC because the discovery permitted by the order was irrelevant, otherwise obtainable, and unduly burdensome.[6] Much of the discovery order concerned a project called the "Bucket Brigade" for which volunteers collected and analyzed air quality samples in Albuquerque's San Jose neighborhood, where the Honstein plant is located. EHD, while defending its position at the adjudicatory hearing, sought discovery regarding the air quality sampling conducted by the Bucket Brigade because it concerned "a key piece of SWOP's evidence of alleged air pollution in the San Jose neighborhood, which otherwise [could not] be obtained because it [was] in the sole possession of SWOP." SWOP was the sole entity conducting the Bucket Brigade project. SWOP claims the information was irrelevant because SWOP did not introduce any of the requested discovery at the hearing and none of their witnesses relied upon it. SWOP's argument wrongly equates relevancy for purposes of discovery with admissibility of evidence. *See Pincheira v. Allstate Ins. Co.*, 2008-NMSC-049, ¶ 22, 144 N.M. 601, 190 P.3d 322 ("The broad and flexible right to discovery allows discovery of information that may not be admissible under the rules of evidence." (internal quotation marks and citation omitted)). The mere fact that the Bucket Brigade related information was not admitted into evidence at the hearing does not render it irrelevant for purposes of discovery. SWOP offers no compelling reason for this Court to conclude that the hearing officer permitted the discovery of irrelevant information or otherwise violated 20.11.81.14(J)(1) NMAC.

**{27}**    SWOP further contends that discovery was unnecessary given that the hearing officer required the parties to file all their technical testimony in writing beforehand, and that the production of this written testimony eliminated any surprise that could have occurred at the hearing. Although we agree that discovery is intended to eliminate surprise at the eventual trial or hearing, the hearing officer can also order discovery for

witnesses, SWOP fails to cite to specific evidence in the record that would allow us to evaluate this claim and therefore, we decline to consider it further. *SeeError! Main Document Only. Curry v. Great Nw. Ins. Co.*, 2014-NMCA-031, ¶ 28, 320 P.3d 482 ("Where a party cites no authority to support an argument, we may assume no such authority exists.").

6SWOP fails to indicate anywhere in the record that the discovery permitted by the order was otherwise obtainable and unduly burdensome. "It is not our practice to rely on assertions of counsel unaccompanied by support in the record." *Chan v. Montoya*, 2011-NMCA-072, ¶ 9, 150 N.M. 44, 256 P.3d 987 (internal quotation marks and citation omitted). Thus, we need not address this argument further.

the parties to fill in gaps of information and resolve underlying issues. *See Reed v. Furr's Supermarkets, Inc.*, 2000-NMCA-091, ¶ 13, 129 N.M. 639, 11 P.3d 603 ("The design of the discovery process is to avoid surprise in trial preparation and promote the opposing party's ability to obtain the evidence necessary to evaluate and resolve the dispute." (alteration, internal quotation marks, and citation omitted)). We discern no error in the hearing officer's order granting EHD's request for additional discovery.

**{28}** Finally, SWOP argues that the hearing officer acted arbitrarily and capriciously by requesting more from the parties in the discovery order than is required by the regulations. The relevant regulation provides that "[t]he statement of intent to present technical evidence shall include . . . a summary or outline of the anticipated direct testimony of each witness[.]" 20.11.81.14(H)(2)(e) NMAC. Here, the parties were required to (and did) file notices of intent to present technical testimony that included, among other things, "testimony of each witness in full narrative fashion[.]" However, even assuming without deciding that requiring a full narrative description was error, SWOP has not demonstrated that the added burden affected the outcome of the hearing. *See In re Convisser*, 2010-NMSC-037, ¶ 32, 148 N.M. 732, 242 P.3d 299 ("On appeal [of an administrative decision], error will not be corrected if it will not change the result." (internal quotation marks and citation omitted)); *In re Norwest Bank of N.M., N.A.*, 2003-NMCA-128, ¶ 14, 134 N.M. 516, 80 P.3d 98 (holding that misapplication of a procedural rule made no difference to the outcome of the case, and accordingly there was no need to correct the error on appeal). We conclude that the hearing officer did not act arbitrarily, capriciously, or not in accordance with the law in granting the request for discovery.

## V.     The Hearing Officer Did Not Err in Applying the Rules of Evidence

**{29}** SWOP argues that the Board's hearing officer applied the New Mexico Rules of Evidence in a manner that was arbitrary,[7] capricious, and contrary to the Board's regulations. The regulations provide that the Board and the hearing officer may look to the rules of evidence for guidance "[i]n the absence of a specific provision in 20.11.81 NMAC governing an action[.]" 20.11.81.12(A) NMAC. Thus, in order to show that the Board acted contrary to law, SWOP must demonstrate that the hearing officer applied the rules of evidence in lieu of the Board's regulations.

**{30}** SWOP contends that the hearing officer erroneously sustained EHD's objection to a witness testifying "about health concerns that community members had expressed to him." However, based on our review of the record, EHD objected based on its belief that the witness was testifying to "causation" and the hearing officer concluded that "causation as to health concerns is a matter of . . . technical expertise." Pursuant to 20.11.81.14(I)(2) NMAC, only "non-technical" testimony is permitted at a public

---

[7]SWOP argues that the hearing officer arbitrarily applied the rules of evidence. However, because SWOP does not make individual arguments as to how these evidentiary rulings were in error, we decline to address SWOP's argument further. *See Muse v. Muse*, 2009-NMCA-003, ¶ 72, 145 N.M. 451, 200 P.3d 104 ("We will not search the record for facts, arguments, and rulings in order to support generalized arguments.").

comments hearing. As such, it was proper for the hearing officer to exclude the testimony on causation pursuant to the regulations. 20.11.81.12(B)(2)(b) NMAC.

**{31}** SWOP also argues that the hearing officer improperly applied the legal residuum rule, which requires that administrative actions be "supported by some evidence that would be admissible in a jury trial." *Duke City Lumber*, 1984-NMSC-042, ¶ 19. Nothing in 20.11.81 NMAC mentions the legal residuum rule. However, the hearing officer was permitted to apply the rules of evidence that govern the admissibility of evidence. *See* 20.11.81.12(A) NMAC ("In the absence of a specific provision . . . the board's hearing officer may look to the . . . New Mexico Rules of Evidence for guidance." (citation omitted)). Moreover, this Court has previously applied the legal residuum rule to proceedings before the Board. *See Duke City Lumber Co. v. N.M. Env't Improvement Bd.*, 1984-NMCA-058, ¶ 6, 102 N.M. 8, 690 P.2d 451 (indicating that the legal residuum rule applies when a substantial right is at stake). Consequently, we detect no error in the hearing officer's application of the legal residuum rule.

**CONCLUSION**

**{32}** For the foregoing reasons, we affirm.

**{33} IT IS SO ORDERED.**

**BRIANA H. ZAMORA, Judge**

**WE CONCUR:**

**JENNIFER L. ATTREP, Judge**

**MEGAN P. DUFFY, Judge**